[No. H027521. Sixth Dist. June 10, 2005.]

In re MICHAEL LOWE, On Habeas Corpus.

**COUNSEL**

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Frances T. Grunder, Assistant Attorney General, Anya M. Binsacca and Brian G. Walsh, Deputy Attorneys General, for Appellant.

William Lionel Schmidt and Gary M. Diamond for Respondent.

OPINION

**MIHARA, J.**—In 1985, Michael Lowe shot and killed the victim, Michael Sanchez. Pursuant to a plea bargain, Lowe pleaded guilty to second degree murder (Pen. Code, § 187) and admitted that he personally used a firearm in the commission of that offense (Pen. Code, §§ 12022.5, 1203.06). Lowe was sentenced to the indeterminate prison term of 15 years to life; the two-year term for the firearm enhancement was stayed.

In 2002, the Board of Prison Terms (hereinafter the Board) found Lowe suitable for parole and set a release date. The former Governor of California, Gray Davis, (hereinafter the Governor) reviewed and reversed the Board's decision, finding that Lowe would "pose an unreasonable risk of danger to society if released from prison." (Cal. Code Regs., tit. 15, § 2402, subd. (a);[1] see Pen. Code, § 3041.2; Cal. Const., art. V, § 8.) Thereafter, Lowe filed a petition for writ of habeas corpus in Santa Clara County Superior Court, challenging the Governor's decision. The superior court granted the writ and issued an order directing Lowe's release.

The Governor has appealed the superior court's decision to this court. We have stayed the trial court's order pending appeal. We now reverse the trial court's order granting Lowe's release and reinstate the Governor's decision reversing the Board's decision to grant parole.

## I. Background

### A. The Commitment Offense

The following description of Lowe's offense is taken from the Governor's decision reversing the Board's decision to grant parole.

"On October 1981, 34-year-old Michael Lowe met 15-year-old Michael Sanchez at a meeting for homosexual Catholics. Mr. Sanchez was struggling with issues relating to his homosexuality and had a difficult relationship with his parents. The two became close and Mr. Sanchez's parents allowed Mr. Lowe to assume legal guardianship of their son the following year. Mr. Lowe and Mr. Sanchez moved into a two-bedroom condominium in Cupertino.

"While the relationship initially appeared to be platonic, according to the probation officer's report, it eventually developed into a sexual relationship.

---

[1] We will reference this title of the California Code of Regulations as Regs. in the remainder of this opinion.

The relationship over the next few years, however, was tumultuous. According to Mr. Lowe, Mr. Sanchez repeatedly lashed-out at him with physical and psychological abuse.

"In December 1983, Mr. Lowe purchased a .38 caliber pistol. He claims he planned to use it to commit suicide.

"According to Mr. Lowe, after a fight with Mr. Sanchez (then 18 years old) on January 21, 1984, he packed his bags to leave. Early the next morning, he loaded the pistol and carried it into the bedroom where Mr. Sanchez was sleeping. He claims he intended to say goodbye and then drive to the hills and commit suicide. Instead, however, he fired five shots into Mr. Sanchez's head and chest, killing him.

"After the shooting, Mr. Lowe went to sleep in the living room. When he awoke, he left the house and drove around for a couple of hours. He then returned and wrapped Mr. Sanchez's body in sheets and blankets. He left the corpse on the bed for approximately two months and continued to live in the condominium.

"In March 1984, Mr. Lowe bought plywood and built a six-foot by two-foot box. He placed Mr. Sanchez's body in the 'coffin' with mothballs to conceal the odor. He nailed the box closed and sealed it with caulking to provide an extra shield against the smell. He used the coffin as a nightstand and planned eventually to put the body in a storage locker.

"Meanwhile, with Mr. Lowe's permission, the owner of the condominium allowed various realtors to show the property to prospective buyers. In late April 1984, one of the prospective buyers smelled an odor emanating from the coffin and called the police. Mr. Lowe returned home while investigators were in the condominium. When he saw police cars in front of the building, he fled.

"In July 1984, Mr. Lowe surrendered."

### B. 2002 Board of Prison Terms Hearing

On December 5, 2002, the Board held a "Subsequent Parole Consideration Hearing" to consider whether 55-year-old Lowe was suitable for parole. The Board considered the nature of the commitment offense, any prior criminality, Lowe's social history, his behavior and programming since his commitment, prior transcripts, Lowe's "central file," his progress since his

last hearing, new and prior psychiatric reports, and any change in Lowe's parole plans, in addition to the testimony given at the hearing by Lowe and by the district attorney. The Board also considered a psychological evaluation prepared in 2002 by Dr. John Shields and Dr. Steven Silberstein as well as prior psychological evaluations prepared for the prior parole suitability hearings in which Lowe was found to be unsuitable for parole.

The Board granted parole at the 2002 hearing because it concluded that Lowe was "suitable for parole and would not pose an unreasonable risk of danger to society or threat to public safety if released from prison."

In so concluding, the Board relied upon several circumstances. It noted that Lowe had no juvenile record of assaulting others and no other adult crime besides the commitment offense, he had a stable social history, he has stable relationships with his family and others, and he has "enhanced his ability to function within the law upon release" by participating in an education program and in a "self-help and therapy programs" as well as by participating a vocational program for "electronic processing." The Board felt defendant's "maturation, growth, greater understanding, and advanced age" have "reduced the probability of recidivism." It noted that Lowe has realistic parole plans, family support, a place to stay, an offer of help with finding a job, and a trust fund so that he has the "means to support himself and not be a burden to society while he's reintegrating back into society." The Board further considered that Lowe "has recently maintained positive institutional behavior which indicates significant improvement in self-control." The Board noted Lowe's two administrative disciplinary write-ups in 1988 and 1993; although the second incident involved participation in an "illegal sex act," the Board felt the incident was remote and that Lowe "has not been involved in any type of other negative behaviors." The Board also relied upon the fact that Lowe "shows signs of remorse" and "a desire to change towards good citizenship." The Board took into consideration that the Santa Clara County Deputy District Attorney who appeared at the hearing did not voice any objection to Lowe's parole and said that he personally did not perceive Lowe "to be a threat to his county or to the People of California." The Board also took into account that the 2002 psychiatric report that concluded that Lowe's "violence potential outside of a controlled setting is extremely low" and that "any indication of violence is very unlikely."

The Board proceeded to determine Lowe's parole date. It selected a "aggravated" base term for his offense of 240 months plus 12 months for the weapon based on the following aggravating circumstances regarding the crime: (1) Lowe "occupied a position of leadership and dominance over the victim," (2) during the commission of the crime, he had "a clear opportunity to cease but instead continued," and (3) he "had a special relationship of

confidence and trust with the victim." (Regs., § 2403, subd. (c).) Lowe was given 56 months of credit against this term, reducing it to 196 months total period of confinement" (16 years and 4 months) beginning in August 1985. (Regs, § 2410 [Four months of credit for each year served, minus two years for the two "disciplinaries in prison"].) The Board's decision was effective on April 4, 2003.

### C. The Governor's Reversal of the Board's Decision

On May 2, 2003, the Governor notified Lowe that the Governor was invoking his authority, pursuant to article V, section 8, subdivision (b) of the California Constitution and Penal Code section 3041.2, to reverse the Board's decision to grant Lowe parole. The Governor provided Lowe with a four-page statement describing the basis for the Governor's decision. We already have quoted the first seven paragraphs describing the facts of the murder. The Governor then noted that Lowe had been charged with first degree murder, that he had pleaded guilty to second degree murder with an enhancement for using a firearm, and that he had been sentenced to a term of 15 years to life. After conceding that Lowe "has demonstrated some progress during his incarceration" by attending a "self-help and therapy program," including "Commitment to Change, Conflict Resolution, Stress Management, [and] Problem Solving," had earned an educational degree and two vocational certificates, had held various jobs during his imprisonment, and has "received numerous laudatory reports," the Governor stated that, "[d]espite these positive factors, however, I believe the following negative factors outweigh his gains at this time."

The next paragraph contains a summary and analysis of the facts, which we quote in full: "Mr. Lowe committed an especially heinous and atrocious crime with an exceptionally callous disregard for human suffering. He purchased the gun shortly before the murder. Then, in the middle of the night, he loaded the gun, entered Mr. Sanchez's room, and shot him five times in the head and chest, execution style. These actions indicate planning and premeditation. Mr. Lowe's victim was particularly vulnerable. He was unarmed, asleep, unsuspecting, and in a special relationship of confidence and trust with his killer. Also, Mr. Lowe's motive for the crime—anger and frustration over his relationship with a teenager—is inexplicable or very trivial in relationship to the offense."

The Governor next evaluated Mr. Lowe's behavior after the murder as follows: "After the shooting, Mr. Lowe demonstrated a total lack of compassion and remorse. Rather than calling for medical attention, he went to sleep in the next room. When he awoke, he went for a drive and then returned to the house to hide Mr. Sanchez's body. He wrapped the body in sheets and

bedding and left it on the bed for approximately two months. He also removed portions of the mattress that had been stained by Mr. Sanchez's blood and threw the murder weapon in the garbage. [¶] Meanwhile, he continued living in the home and appeared more relaxed to those who knew him. According to the probation officer['']s report, he even carried on a conversation with someone while standing about five feet from the dead body. Demonstrating a shocking, ghoulish depravity, he later built a makeshift coffin, hid the body inside, using mothballs and caulking to conceal the odor. He used this coffin as a nightstand for months, planning ultimately to put the body in a storage locker. He apparently never intended to provide Mr. Sanchez a proper burial or tell his parents that their son was dead."

In the next paragraph, the Governor noted that, in his opinion, "[t]he facts of this offense are especially heinous and atrocious, demonstrating an exceptionally callous disregard for human suffering. There is clear evidence of premeditation, the murder was a cold-blooded execution, and the victim's body was kept as a furnishing for months. These are particularly egregious acts, far more aggravated than the minimum necessary to sustain a second degree murder conviction. Thus, notwithstanding Mr. Lowe's commendable accomplishments and behavior while in custody, *the gravity of the crime alone justifies his further incarceration.* However, additional negative factors also indicate that he continues to pose an unreasonable danger to society." (Italics added.)

In the next two paragraphs, the Governor set forth his additional concerns regarding whether Lowe still poses an unreasonable danger to society: "I am concerned that Mr. Lowe has *not accepted adequate responsibility for his brutal crime,* which indicates a *continuing lack of remorse.* Mr. Lowe's version of the shooting is unbelievable. He claims that he went into the victim's bedroom, intending only to say goodbye and then leave. If this is true, I question why he loaded the gun and took it with him into the bedroom. He also claims that he did not intend to fire the gun, but rather, his hand 'tensed' and 'involuntarily squeezed' the trigger. However, the gun Mr. Lowe used required him to pull the trigger five separate times to fire five rounds. Also, according to the file, the recoil from the first shot would have required him to aim the subsequent shots in order the strike the victim as he did. These implausible aspects of Mr. Lowe's story indicate that *he continues to lack candor, minimize his culpability, and refuse to accept adequate responsibility.* [¶] Furthermore, I am concerned that Mr. Lowe blames his victim for the circumstances that led to the crime. During his last parole hearing, Mr. Lowe said that 'dealing with' Mr. Sanchez caused him to go 'through some very hard times' and led him to separate himself from his family and friends. He claims he decided to commit suicide because of the psychological and physical abuse he suffered in his relationship with Mr. Sanchez. However, I

note that Mr. Lowe was the adult and authority figure in the relationship, not than the victim." (Italics added.)

The Governor next observed that, "[e]ven assuming that Mr. Lowe faced the abuse he alleges, he had many alternatives available. At the time of the shooting, Mr. Sanchez was 18 years old and Mr. Lowe's legal responsibility for him had ended. Thus, Mr. Lowe could have left, asked Mr. Sanchez to leave, or reported Mr. Sanchez's alleged violence to law enforcement. Instead, he chose to kill. Given Mr. Lowe's tendency to deflect his own responsibility by identifying Mr. Sanchez as the problem, I *question whether he has sufficient insight into his own contribution to the circumstances that led to the crime.*" (Italics added.)

The Governor added, "Moreover, Mr. Lowe's characterization of his relationship with Mr. Sanchez is questionable. He denies having had a sexual relationship with Mr. Sanchez. However, he describes feelings that liken to those of a jilted lover, rather than a legal guardian/father figure. Thus, I *question whether Mr. Lowe has acknowledged the true nature of his relationship with Mr. Sanchez.* Until he does, there remains an unacceptable risk that he might repeat the mistakes that led him to kill. Thus, I encourage him to continue his programming efforts and attempt to address these issues." (Italics added.)

After reiterating that Lowe's evaluations suggest he has "made progress," the Governor expressed concern that, "given the viciousness and depravity of this crime, *his gains are too recent to ensure that they will continue in a less controlled setting.* His last Life Prisoner Evaluation estimated that he would pose a low degree of threat to the community if released. However, his previous five Life Prisoner Evaluations found that he posed either an unpredictable or moderate degree of threat. Given the gravity of his crime, I believe he *requires additional time to demonstrate that he can maintain his gains before he reenters society.*" (Italics added.)

The Governor concluded that "*each of the negative factors individually outweighs all of the positive factors*" and that, therefore Mr. Lowe "poses an unreasonable danger to society at this time. I therefore REVERSE the Board of Prison Terms' decision to parole Mr. Lowe." (Italics added.)

### D. Habeas Corpus Proceedings

In August, 2003, Lowe filed a petition for a writ of habeas corpus in the Santa Clara County Superior Court challenging the Governor's decision. He alleged that the Governor's decision to reverse the Board violated due process for four reasons. First, he alleged the Governor's decision was

"Rubber-Stamped" by the Governor and was made without the Governor's personal review of the record. (Italics omitted.) Second, he alleged the decision was "Boilerplate" and did not reflect individualized consideration. (Italics omitted.) Third, he alleged the decision to deny parole was based mainly on factors he cannot change or control. Fourth, he alleged the factors the Governor relied upon to deny parole "were Supported by No Evidence and Contrary to the Record and to Petitioner's Forensic Evaluations, and were False, Irrelevant, Inapplicable, and/or Inherent in all Such Offenses, and Because Petitioner's Criminal Conduct was not Particularly Egregious when Compared to that of Others Who Committed a Second-Degree Murder While in a Tortured Mental State." (Italics omitted.) Lowe also alleged that the Governor's action violated the terms of his plea bargain because "[t]he plea contract did not include the added parole prerequisite of being found suitable by a second tribunal, the Governor . . . ."

In September 2003, the superior court issued an order to show cause. In October 2003, the Governor filed a return. The return asserted that the Governor's decision was supported by some evidence and that the Governor did not "act arbitrarily and capriciously, or abuse his discretion in finding [Lowe] unsuitable for parole." The return also denied that the Governor's reversal of the Board "amounts to a violation of [Lowe's] plea agreement." In February 2004, Lowe filed a denial and traverse.

On May 21, 2004, the superior court issued an order granting Lowe's petition and ordering Lowe "released per the terms of his parole."[2] The court found that Lowe had entered into a plea agreement with the "express and implied promise" that "the Parole Board would analyze his crime as being second degree murder and if the Parole Board granted him parole he would be released on parole." Citing *People v. Gipson* (2004) 117 Cal.App.4th 1065 [12 Cal.Rptr.3d 478], the court said that this was "the 'bargained for quid pro quo.' " The court noted that the " 'existing applicable law' " at the time of this plea bargain "contract" with the state was that "if Petitioner was granted parole by the Parole Board he would, in actual fact, be released on parole." It then explained that "Petitioner was granted parole but pursuant to a constitutional amendment enacted 3 years after Petitioner's plea, (Const. Article V. section 8, Proposition 89, [Penal Code] § 3041.2 (1988),) the Governor exercised a previously nonexistent power to reverse that parole."

Based upon its above analysis, the court concluded that the "Governor's exercise of this new power violated Petitioner's plea bargain and thus the Constitution." It distinguished its analysis from the California Supreme Court's decision in *In re Rosenkrantz* (2002) 29 Cal.4th 616 [128 Cal.Rptr.2d 104, 59 P.3d 174] (*Rosenkrantz*), by claiming that the Supreme Court only

---

[2] The record before us does not contain any indication that an evidentiary hearing was held.

examined "the retroactive application of the Governor's parole power with the analytical framework of the Ex Post Facto Clause" in the context of a conviction rendered by a jury while, here, we are considering a plea bargain, in which the "Contracts Clause and the Due Process Clause provide additional protections to the defendant entering that contract."

As an alternative reason for reversing the Governor's decision, the trial court concluded "there was no factual basis for the reversal of the Parole Board." The trial court added that, apart from what it labeled vague and imprecise criteria, "[w]hat remains of the Governor's decision is a characterization of the crime as demonstrating 'evidence of premeditation' and a conclusion that 'the murder was a cold blooded execution.'" The court felt that this characterization of the crime as a first degree murder is a separate and distinct violation of the plea bargain.

On June 3, 2004, the Governor filed a timely notice of appeal from the superior court's order granting Lowe's petition. On June 15, 2004, this court issued a stay of that order. On appeal, the Governor contends the superior court erred in its application of the "some evidence" standard of review and impermissibly reweighed the evidence before it to reach a different conclusion than the one reached by the Board. The Governor also contends there was no violation of Lowe's plea bargain. For the reasons stated below, we conclude there was no constitutional violation of Lowe's plea bargain and that, because there is *some evidence* in the record supporting the Governor's unsuitability finding, the superior court order granting the petition must be reversed.

## II. Analysis

### A. Statutes and Regulations Governing Parole Suitability Hearings

In *In re Smith* (2003) 114 Cal.App.4th 343 [7 Cal.Rptr.3d 655] (*Smith*), we recently set forth the relevant law governing parole suitability hearings. We quote from *Smith* as follows: "Under section 3041, subdivision (a), release on parole is the rule, rather than the exception. This section requires that the Board set a release date unless it determines that 'consideration of the public safety requires a more lengthy period of incarceration . . . .'" (§ 3041, subd. (b).) In making this determination concerning convicted murderers, the Board is guided by the criteria set forth in title 15, division 2, chapter 3, article 11 of the California Code of Regulations. (Regs., § 2400.) Section 2401 of the Regulations requires the Board to set a release date if the prisoner is found suitable for parole under Regulations section

2402, subdivision (d), which enumerates circumstances tending to show suitability; conversely, the Board must deny a parole date if the prisoner is found unsuitable under Regulations section 2402, subdivision (c), which enumerates circumstances tending to show unsuitability." (*Id.* at pp. 351–352, fn. omitted.)

■ "Circumstances showing suitability are that (1) the prisoner has no record of assaultive conduct as a juvenile; (2) the prisoner has a stable social history; (3) the prisoner by word and/or deed has shown remorse for the commitment crime; (4) the prisoner committed the crime as the result of significant stress in his life, especially if the stress has built over a long period of time; (5) the prisoner committed the offense as a result of battered woman syndrome; (6) the prisoner lacks any significant history of violent crime; (7) the prisoner is of an age that reduces the probability of recidivism; (8) the prisoner has made realistic plans for release or has developed marketable skills that can be put to use upon release; and (9) the prisoner has engaged in institutional activities that indicate an enhanced ability to function within the law upon release. (Regs., § 2402, subd. (d)(1)–(9).) [¶] Circumstances showing unsuitability are that (1) the prisoner committed the offense in an especially heinous, atrocious, or cruel manner—i.e., multiple people were attacked, injured, or killed; the offense was committed in a dispassionate and calculated manner, such as execution-style; victim was abused, defiled or mutilated; the offense was committed with an exceptionally callous disregard for human suffering; . . . the motive was trivial relative to the offense; (2) the prisoner has a previous record of violence; (3) the prisoner has an unstable social history; (4) the prisoner previously has sexually assaulted another individual in a sadistic manner; (5) the prisoner has a lengthy history of severe mental problems related to the offense; and (6) the prisoner has engaged in serious misconduct while in prison. (Regs., § 2402, subd. (c)(1)–(6).)" (*Smith, supra,* 114 Cal.App.4th at p. 352, fn. 7.)

"Section 2402, subdivision (a) of the Regulations generally provides, in relevant part, 'Regardless of the length of time served, a life prisoner shall be found unsuitable for and denied parole if in the judgment of the panel the prisoner will pose an unreasonable risk of danger to society if released from prison.' . . . [S]ection 2402, subdivision (b) requires the Board to consider '[a]ll relevant, reliable information available' in determining suitability." (*Smith, supra,* 114 Cal.App.4th at p. 352.)

### B. Relevant Standard of Review

Our recent opinion in *Smith* set forth the relevant standard of review.

■ "The petitioner in a habeas corpus proceeding bears the ultimate burden of proving the factual allegations that serve as the basis for his or her

request for habeas corpus relief. [Citation.] Once the issues of fact have been joined by the respondent's filing of the return to the petition and the petitioner's filing of the traverse, the court may deny relief if it concludes that the petitioner has not alleged facts sufficient to warrant relief. [Citation.] If relief depends upon the resolution of disputed issues of fact, the court may order an evidentiary hearing and make findings of fact with regard to such issues. [Citation.] The various exhibits that may accompany the petition, return, and traverse do not constitute evidence, but rather supplement the allegations to the extent they are incorporated by reference. [Citation.] At the evidentiary hearing, such exhibits are subject to admission into evidence in accordance with generally applicable rules of evidence. [Citation.]" (*Rosenkrantz, supra,* 29 Cal.4th at p. 675.)

"As noted, the court below did not conduct an evidentiary hearing but reached its decision based on the exhibits attached to the petition and return. Under the circumstances, we shall independently review the record." (*Smith, supra,* 114 Cal.App.4th at pp. 360–361; see *In re Serrano* (1995) 10 Cal.4th 447, 457 [41 Cal.Rptr.2d 695, 895 P.2d 936].)

■ "In *Rosenkrantz, supra,* 29 Cal.4th 616, the California Supreme Court addressed the judicial review standard that applies to parole decisions by the Board and the Governor. The court first held that 'the judicial branch is authorized to review the factual basis of a decision of the Board denying parole in order to ensure that the decision comports with the requirements of due process of law, but that in conducting such a review, the court may inquire only whether *some evidence* in the record before the Board supports the decision to deny parole, based on the factors specified by statute and regulation.' (*Id.* at p. 658, italics added.)" (*Smith, supra,* 114 Cal.App.4th at p. 361.)

■ "[U]nder California law the factual basis for a Board decision granting or denying parole is subject to a limited judicial review under the 'some evidence' standard of review." (*Rosenkrantz, supra,* 29 Cal.4th at p. 652.) Specifically, when reviewing a decision to deny parole, we inquire "whether some evidence in the record before the Board supports the decision to deny parole, based upon the factors specified by statute and regulation." (*Id.* at p. 658.)[3] A Board decision to deny parole without any basis in fact "would be arbitrary and capricious, thereby depriving the prisoner of due process of law." (*Id.* at p. 657.)

---

[3] We simply note that the same standard applies to judicial review of the Governor's parole decisions made pursuant to article V, section 8, subdivision (b) of the California Constitution. (*Rosenkrantz, supra,* 29 Cal.4th at p. 667.)

■ "Article V, section 8[, subdivision] (b), requires that a parole decision by the Governor pursuant to that provision be based upon the same factors the Board is required to consider. Due process of law requires that this decision be supported by some evidence in the record." (*Rosenkrantz, supra,* 29 Cal.4th at pp. 676–677.)

■ *Rosenkrantz* explained that "[o]nly a modicum of evidence is required. Resolution of any conflicts in the evidence and the weight to be given the evidence are matters within the authority of the Governor. . . . [T]he precise manner in which the specified factors relevant to parole suitability are considered and balanced lies within the discretion of the Governor, but the decision must reflect an individualized consideration of the specified criteria and cannot be arbitrary or capricious. It is irrelevant that a court might determine that evidence in the record tending to establish suitability for parole far outweighs evidence demonstrating unsuitability for parole." (*Rosenkrantz, supra,* 29 Cal.4th at p. 677.)

■ Here, as in *Smith,* we review the trial court's decision and the contentions of the parties in light of the materials that properly were before that court. Since the trial court's findings were based solely upon documentary evidence, we independently review the record. (*Smith, supra,* 114 Cal.App.4th at pp. 360–361; *Rosenkrantz, supra,* 29 Cal.4th at p. 677.)

■ We also engage in de novo review of relevant issues of law, including the proper interpretation of article V, section 8, subdivision (b) of the California Constitution, the effect of a plea bargain for an indeterminate sentence, the superior court's subject matter jurisdiction, and the application of the some evidence standard utilized by the superior court. (*Redevelopment Agency of City of Long Beach v. County of Los Angeles* (1999) 75 Cal.App.4th 68, 74 [89 Cal.Rptr.2d 10].) The California Supreme Court has held that if "the inquiry requires a critical consideration, in a factual context, of legal principles and their underlying values, the question is predominantly legal and its determination is reviewed independently." (*Crocker National Bank v. City and County of San Francisco* (1989) 49 Cal.3d 881, 888 [264 Cal.Rptr. 139, 782 P.2d 278].) Similarly, when the resolution of an issue on appeal requires the court to consider abstract legal doctrines, to weigh underlying policy considerations, and to balance competing legal interests, de novo review is appropriate. (*In re Collins* (2001) 86 Cal.App.4th 1176, 1181 [104 Cal.Rptr.2d 108].) Here, de novo review also is appropriate because this appeal requires the review of a superior court decision that is in contravention of controlling legal authority dealing with issues such as the Governor's

constitutional authority that empowers him to reverse grants of parole (Cal. Const., art. V, § 8), and because this court must address serious public policy considerations concerning the Governor's power to exercise his constitutional authority over parole suitability determinations and balance petitioner's interest in release on parole against the Governor's interest in protecting the public.

### C. Alleged Violation of Defendant's Plea Bargain

The superior court's order characterizes Lowe's plea bargain as incorporating a promise that Lowe "would be considered for parole" by "the Department of Corrections" "based on his conviction being of the second degree and an examination of his performance in prison." From the above, the superior court concludes the Governor's decision to reverse the Board violates Lowe's plea bargain because "[a]llowing retroactive application of [Penal Code] § 3041.2 would essentially mean the plea contract's repudiation and destruction" and because the Governor recharacterized "the crime as first degree murder."

The Board is the administrative agency in the executive branch authorized to grant or deny parole. (Pen. Code, § 3040 et seq.) In November 1988, California voters added article V, section 8, subdivision (b) to the California Constitution, vesting the Governor with the constitutional authority to review the Board's decisions concerning parole for individuals convicted of murder and serving indeterminate sentences. "The Governor may only affirm, modify, or reverse the decision of the parole authority on the basis of the same factors which the parole authority is required to consider." (Cal. Const., art. V, § 8, subd. (b).) The Penal Code and regulations promulgated in the California Code of Regulations set forth the criteria to be used by the Board and the Governor in parole decisions.

In *Rosenkrantz*, the petitioner challenged the Governor's reversal of the Board's decision granting parole based upon the fact that he had committed his crime and been convicted before article V, section 8, subdivision (b) of the California Constitution had been adopted. (*Rosenkrantz, supra,* 29 Cal.4th at pp. 636–637.) He contended the Governor's exercise of his new power under Proposition 89 violated the ex post facto clauses of the state and federal constitutions. (*Id.* at pp. 637–638.) Disagreeing with petitioner, the *Rosenkrantz* court found that the petitioner's continued incarceration did not impermissibly extend his incarceration since he still was serving a life term and since the substantive standards governing parole suitability were unaltered given that the Governor was required to consider the same factors as the Board. The court reasoned that gubernatorial review, rather than review only by the Board, did not violate the petitioner's rights since he had no

reasonable expectation concerning the identity of the person or persons exercising discretion over the suitability determination. (*Id.* at pp. 639–640.) Thereafter, the Ninth Circuit agreed that "the law itself is neutral inasmuch as it gives the governor power to either affirm or reverse a [Board of Prison Term's] granting or denial of parole. Moreover, the governor must use the same criteria as the [Board]. The law, therefore, simply removes final parole decisionmaking authority from the [Board] and places it in the hands of the governor." (*Johnson v. Gomez* (1996) 92 F.3d 964, 967.)

While the superior court's order superficially acknowledges the ex post facto holding in *Rosenkrantz*, it recharacterizes the ex post facto claim discussed in *Rosenkrantz* as either a due process or a contracts clause constitutional violation in the context of a plea bargain. For the reasons stated below, we agree with the Governor that Lowe's constitutional rights under the due process clause and the contracts clause were not violated in this case.

Initially, we note our agreement with the Governor that the superior court should not have considered the due process or contract clause constitutional issues in question since Lowe's petition in superior court did not raise those specific allegations regarding his plea bargain, and "[i]t is the interplay between the return and the petitioner's response to the return in a pleading called the traverse, that frames the issues the court must decide in order to resolve the case." (*In re Serrano* (1995) 10 Cal.4th 447, 455 [41 Cal.Rptr.2d 695, 895 P.2d 936]; see also *People v. Enriquez* (1977) 19 Cal.3d 221, 230 [137 Cal.Rptr. 171, 561 P.2d 261], disapproved on other grounds in *People v. Cromer* (2001) 24 Cal.4th 889, 901, fn. 3 [103 Cal.Rptr.2d 23, 15 P.3d 243].)

In any event, we are not persuaded by the superior court's reasoning.

We first note that, although the superior court relied upon *Lynce v. Mathis* (1997) 519 U.S. 433 [137 L.Ed.2d 63, 117 S.Ct. 891], to suggest that the Governor's review constitutes a due process violation rather than an ex post facto claim, it admitted that the court in *Lynce* was "predominantly relying on the Ex Post Facto Clause." The superior court then supported its claim that the *Lynce* court "also concluded as it did because of the plea bargain" by quoting the dictum in *Lynce* at page 440: " 'The specific prohibition on ex post facto laws is only one aspect of the broader constitutional protection against arbitrary changes in the law.' " (Italics omitted.) This broad dictum does not necessarily support the superior court's conclusions regarding the application of the contract clause or the due process clause to the propriety of the Governor reviewing the Board's parole suitability determination.

Furthermore, Lynce had accepted a plea bargain that involved a *fixed sentence* with the opportunity to earn credits, but, six years later, through the retroactive application of a statute, he lost over a thousand days of custody credits. (*Lynce, supra,* 519 U.S. at pp. 435–436.) The United States Supreme Court invalidated the loss of credits in order to give Lynce the benefit of his bargain. (*Id.* at pp. 445–446.) In the case before us, by contrast, Lowe pleaded guilty to second degree murder and received *an indeterminate life term.* Accordingly, the Governor's decision did not violate Lowe's procedural due process since "it cannot reasonably be said that the adoption of article V, section 8(b), *increased the punishment* for [his] offense." (*Rosenkrantz, supra,* 29 Cal.4th at p. 640.) We also find no procedural or substantive due process violation since (1) the Governor is required to consider "*the same factors as the Board,*" (2) the new constitutional provision merely changed the parole procedure by adding a new level of review within the executive branch, and (3) when Lowe entered his plea to second degree murder, he "had no reasonable expectation regarding the identity of the person or persons who would exercise discretion in evaluating his . . . suitability for parole, or that the person or persons who would make such a decision would not change over time." (*Rosenkrantz, supra,* 29 Cal.4th at pp. 640–641; see also *In re Morrall* (2002) 102 Cal.App.4th 280, 304–306 [125 Cal.Rptr.2d 391].)

 In light of the above, we are convinced the due process clauses of our state and federal Constitutions are not violated by the fact that the Governor, in reviewing the Board's decisions, may disagree with the Board's determination that a prisoner is suitable for parole. Lowe was granted parole by the Board in 2002 *subject to the Governor's final review,* and he can "only speculate" whether the Board would have granted him parole "had it possessed the final review authority." (*Johnson v. Gomez, supra,* 92 F.3d 964, 967.)[4] We find no violation of due process based upon a violation of the plea bargain. Lowe entered into the plea agreement explicitly acknowledging that "theoretically under the law it could mean that [he] could serve the remainder of [his] life in prison." He received his initial parole consideration hearing sooner as a result of his plea bargain, but he never was promised, as part of his plea bargain, that a specific release date or his parole suitability would be determined by any particular person or persons.

---

[4] We simply note that every gubernatorial reversal of a Board decision granting parole in cases when an inmate had pleaded guilty would be "constitutionally flawed" if the superior court's analysis were correct, and "[i]t would be surprising, to say the least, to discover such a fundamental constitutional problem at this late date." (*Rosenkrantz, supra,* 29 Cal.4th at p. 638.) However, as discussed above, neither the court's due process analysis nor its contract clause analysis is meritorious.

Lowe's petition alleged that "[i]mposition of this additional gubernatorial obstacle to parole, which has converted petitioner's probability of parole then specified in Pen.C. § 3041(a), to what is now a sentence of life without a possibility of parole, has violated petitioner's plea contract with the State." The superior court's order acknowledged that Lowe received an indeterminate sentence but then states that "[s]ince the plea contemplated that the Parole Board alone would make the parole decision, that express and implied term must be honored." However, defendant's plea bargain agreement was explicitly limited to the "specification" of the degree of the murder as "murder of the second degree" and the accompanying "indeterminate term, fifteen years to life in prison" as "punishment for second degree murder." When the trial court then asked Lowe, "Now, has anybody made any promises or inducements to you aside from the fact the specification of the murder charge would be second degree, other than that have there been any inducements or promises made to as to . . .—what else going to happen in this case?" Lowe responded, "No, there haven't, Your Honor." Lowe also confirmed that he understood and that he could "serve the remainder of [his] life in prison."

Lowe's situation is distinguishable from *Brown v. Poole* (9th Cir. 2003) 337 F.3d 1155, a case in which the Ninth Circuit ordered specific performance of a prisoner's plea agreement. In *Brown*, the prosecutor specifically promised defendant that she only would serve half her term if she remained disciplinary-free. (*Id.* at p. 1161.) That case is similar to *Lynce* in that, because a specific promise had been made, the court could order specific performance. However, as noted in our discussion of *Lynce*, the fact that Lowe had received an indeterminate life sentence distinguishes his case from those where a fixed sentence or promise has been given to the inmate.

Since Lowe received the substantive benefit of his plea bargain, we find no violation of general contract law, no violation of the plea bargain, and no violation of due process on the basis the Governor was permitted to exercise his discretionary review power in this case.

We next consider the superior court's determination that the Governor's reversal of the Board's grant of parole in this case violates Lowe's rights under the contract clause.

We agree with the Governor that this portion of the superior court's order is another attempt by the superior court to recast Lowe's ex post facto claim in order to circumvent the holding in *Rosenkrantz* that "the type of procedural change implemented by article V, section 8, subdivision (b)—i.e., a change that simply created a new level of review, within the executive branch, of parole decisions concerning a specified category of prisoners (thereby chang-

ing the identity of the ultimate decision maker within the executive branch for such parole decisions), but that did not change the substantive standard governing the grant or denial of parole—is *not* the type of change to which the ex post facto clause applies." (*Rosenkrantz, supra,* 29 Cal.4th at p. 638.)

As noted above, our state Supreme Court has found no violation of the ex post facto clause, which is the specific source of a possible due process claim, related to the Governor's ability to review the Board's parole suitability decision. (*Rosenkrantz, supra,* 29 Cal.4th at p. 638.) That finding precludes the superior court from attempting to find a constitutional violation elsewhere through the contracts clause. (*Graham v. Connor* (1989) 490 U.S. 386, 395 [104 L.Ed.2d 443, 109 S.Ct. 1865] [where particular constitutional provision "provides an explicit textual source of constitutional protection" that source, rather than a "generalized notion of 'substantive due process'" governs analysis of due process claims].)

We are convinced that when Lowe entered into his plea bargain to plead guilty to second degree murder and to accept the corresponding indeterminate life sentence, the bargain did not include a promise of a specific release date or a promise that his parole suitability would be made by a particular person or persons. No *substantive* obligations were altered. Because the change in identity of the decision maker was procedural rather than substantive, there was no violation of the contracts clause, which prohibits a state from passing a law that impairs the obligations of existing contracts. (U.S. Const., art I, § 10.)

In summary, we conclude the Governor's act in reversing the Board's parole suitability finding did not violate Lowe's plea bargain, the contracts clause or the due process clause of either the state or the United States constitution.

## D. Evidence to Support the Governor's Decision

We next proceed to the merits of the Governor's claim that the superior court erred by finding that no evidence supported the Governor's unsuitability determination at Lowe's 2002 parole hearing. We independently review the record to determine whether "some evidence" supported the Governor's finding that Lowe was unsuitable for parole. (*Rosenkrantz, supra,* 29 Cal.4th at pp. 676–677.)

The Governor based his conclusion upon a number of unsuitability factors related to the nature of the commitment offense, including the fact that Lowe's commitment offense was particularly "heinous and atrocious" and was carried out in a manner that demonstrated "an exceptionally callous

disregard for human suffering." The Governor pointed to facts that demonstrated that the motive for the murder was trivial relative to the offense. The Governor also found that there was "clear evidence of premeditation, the murder was a cold-blooded execution, and the victim's body was kept as a furnishing for months. These are particularly egregious acts, far more aggravated than the minimum necessary to sustain a second degree murder conviction." The Governor concluded that, "notwithstanding Mr. Lowe's commendable accomplishments and behavior while in custody, *the gravity of the crime alone justifies his further incarceration.*" (Italics added.)

Here, unlike the situation in *Smith*, it is readily apparent that the Governor would have found Lowe "unsuitable for parole solely because of the gravity of the commitment offense . . . ." (*Smith, supra*, 114 Cal.App.4th at p. 373.) As discussed above, the particular circumstances of the commitment offense can, by themselves, provide the "some evidence" that is necessary to uphold the Governor's decision. (*Rosenkrantz, supra*, 29 Cal.4th at pp. 677–679.) For the reasons stated below, we conclude there is some evidence in the record that supports the Governor's conclusion that the gravity of Lowe's commitment offense and the facts and circumstances surrounding that crime warrant a finding that Lowe is unsuitable for parole because he poses an unreasonable danger to society.

The Governor can consider whether the offense was committed "in an especially heinous, atrocious or cruel manner" (Regs., § 2402, subd. (c)(1)) in evaluating suitability for parole. One appropriate consideration in that regard is whether the killing was committed "in a dispassionate and calculated manner." (Regs., § 2402, subd. (c)(1)(B).) As noted above, in this case, the Governor specified how Lowe engaged in dispassionate and calculated conduct to ensure his teenaged victim's death by going out and purchasing a firearm and then shooting him in the middle of the night while he slept naked and vulnerable in the bedroom adjacent to that of defendant. The Governor's comments regarding the fact that Lowe had ingratiated himself to the victim and to the victim's family when the victim was a minor, that he obtained the trust of the victim and his family to the extent that Lowe became the victim's legal guardian, that defendant killed his victim "execution-style" by firing five bullets into his victim's head and chest simply because their relationship had become strained, and that defendant then kept the victim's body inside a makeshift wooden coffin that he used as a nightstand provides *some* evidence that Lowe acted with cold, calculated dispassion. (Regs., § 2402, subd. (c)(1)(B).)[5]

---

[5] "[T]he importance attached to any circumstance or combination of circumstances in a particular case is left to the judgment of the panel." (See Regs., § 2402, subds. (c) & (d); *Rosenkrantz, supra*, 29 Cal.4th at pp. 677–679.) Accordingly, since there is *some* evidence to support the Board's characterization of the commitment offense as very cold-blooded and

The evidence supported the Governor's finding that Lowe's motivations of anger and frustration over his relationship with his teenage victim were inexplicable or trivial and therefore provide no explanation for why Lowe committed this execution-style murder. There also is some evidence to support the Governor's finding that Lowe's behavior after the murder demonstrated a total lack of compassion and remorse since Lowe went to sleep in the next room after the murder, then went for a drive, and finally returned home where he wrapped the body in sheets and bedding and left it on the bed for two months. The fact that Lowe appeared more relaxed after the murder and was able to converse with someone only a few feet from Sanchez's corpse supports the Governor's finding of lack of compassion, and the fact that Lowe later built a wooden coffin, hid Sanchez's body inside, added mothballs and caulking to lessen the odor, and then used that coffin as a nightstand beside his bed for months amply supports the Governor's finding that the commitment offense reveals a "shocking, ghoulish depravity."

Although Lowe did plead guilty to second degree murder, the Governor properly considered the fact that the commitment offense involved planning and premeditation. (*Rosenkrantz, supra,* 29 Cal.4th at p. 679.) While the facts in *Rosenkrantz* did not involve a plea bargain, nothing in the *Rosenkrantz* decision prohibits the Governor from considering evidence of premeditation and deliberation in the context of a plea bargain for second degree murder. (*Ibid.,* see also *People v. Miller* (1990) 50 Cal.3d 954, 993 [269 Cal.Rptr. 492, 790 P.2d 1289] [taking weapon to kill an unarmed victim coupled with absence of provocation evidences premeditation]; *People v. Miranda* (1987) 44 Cal.3d 57, 87 [241 Cal.Rptr. 594, 744 P.2d 1127], disapproved on other grounds in *People v. Marshall* (1990) 50 Cal.3d 907, 933, fn. 4 [269 Cal.Rptr. 269, 790 P.2d 676] [fact defendant brought a loaded gun into a store and shortly thereafter used it to kill an unarmed victim reasonably suggests defendant considered possibility of murder in advance and premeditated the killing].) The California Supreme Court recently cited its *Rosenkrantz* opinion while confirming that "the parole authority may credit evidence suggesting the inmate committed a greater degree of the offense than his or her conviction evidences." (*In re Dannenberg* (2005) 34 Cal.4th 1061, 1095, fn. 16 [23 Cal.Rptr.3d 417, 104 P.3d 783].) Given that title 15 specifically allows the Governor to consider all relevant, reliable evidence (Regs., § 2402, subd. (b)), we are convinced the Governor could consider evidence of planning and premeditation in determining whether Lowe was suitable for parole.

---

calculated, we cannot rely upon the superior court's characterization of that offense as "less aggravated" first degree murder when compared to similar crimes. (*Rosenkrantz, supra,* 29 Cal.4th at pp. 677–679.)

■■■ Judicial review of the Governor's decision is deferential. As noted above, "[d]ue process of law requires that [the Governor's] decision be supported by some evidence in the record. Only a modicum of evidence is required. Resolution of any conflicts in the evidence and the weight to be given the evidence are matters within the authority of the Governor. As with the discretion exercised by the Board in making its decision, the precise manner in which the specified factors relevant to parole suitability are considered and balanced lies within the discretion of the Governor, but the decision must reflect an individualized consideration of the specified criteria and cannot be arbitrary or capricious. It is irrelevant that a court might determine that evidence in the record tending to establish suitability for parole far outweighs evidence demonstrating unsuitability for parole. As long as the Governor's decision reflects due consideration of the specified factors as applied to the individual prisoner in accordance with applicable legal standards, the court's review is limited to ascertaining whether there is *some evidence* in the record that supports the Governor's decision." (*Rosenkrantz, supra,* 29 Cal.4th at pp. 676–677, italics added.)

In light of the above, we are convinced that the Governor's decision that Lowe was unsuitable for parole was supported by *some* evidence related to the specified factors governing parole. In turn, we conclude that the Governor's determination that Lowe was unsuitable for parole was made under his constitutional and statutory authority and in accordance with the requirements of due process. (*In re Dannenberg, supra,* 34 Cal.4th 1061; cf. *Smith, supra,* 114 Cal.App.4th at pp. 374–375.)

■■■ In this case, the superior court erred when it failed to afford the Governor the requisite deference and instead impermissibly reweighed the evidence. Moreover, as petitioner, it is Lowe's burden to demonstrate that the Governor acted arbitrarily or capriciously in denying parole. (*Rosenkrantz, supra,* 29 Cal.4th at pp. 665, 672; *In re Serrano, supra,* 10 Cal.4th 447, 456.) This is an extraordinarily high standard and requires Lowe to show that there was not even a modicum of evidence to support the Governor's decision. (*Rosenkrantz, supra,* 29 Cal.4th at p. 627.) In this case, Lowe failed to make such a showing, and the superior court erred in finding that he did. Instead, the record demonstrates that the Governor's decision in this case is supported by some evidence and "reflects due consideration of the specified factors." (*Id.* at p. 677.) Accordingly, the lower court's order granting the petition should be reversed.

## III. Disposition

The trial court's May 21, 2004 order granting Lowe's petition for writ of habeas corpus and directing that Lowe be "released per the terms of his parole" is reversed. The trial court is directed to enter a new order denying the petition.

Bamattre-Manoukian, Acting P. J., and McAdams, J., concurred.

Respondent's petition for review by the Supreme Court was denied October 26, 2005.