[No. B197193. Second Dist., Div. Three. May 24, 2007.]

In re HENRY RICHARD GRAY on Habeas Corpus.

**COUNSEL**

Rich Pfeiffer, under appointment by the Court of Appeal, for Petitioner Henry Richard Gray.

Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, and Heather Bushman, Deputy Attorney General, for Respondent State of California.

**OPINION**

**KITCHING, J.—**

## INTRODUCTION

In this original writ proceeding, we conclude that the Governor's decision finding petitioner Henry Richard Gray (Gray) unsuitable for parole is not supported by "some evidence." (*In re Rosenkrantz* (2002) 29 Cal.4th 616, 626 [128 Cal.Rptr.2d 104, 59 P.3d 174] (*Rosenkrantz*).) We therefore grant Gray's petition for a writ of habeas corpus.

In 1980, a jury found petitioner Gray guilty of second degree murder with the use of a firearm. (Pen. Code, §§ 187, 12022.5.) The trial court sentenced Gray to 15 years to life in prison. The trial court stayed the two-year term for the firearm enhancement.

On January 27, 2005, the Board of Parole Hearings (the Board) determined Gray was suitable for parole. On June 16, 2005, the Governor, Arnold Schwarzenegger, reversed the decision of the Board. Gray filed a petition for

a writ of habeas corpus, which the trial court and this court summarily denied. The California Supreme Court ordered this court to vacate the summary denial and to issue an order to show cause returnable in the superior court as to why the Governor did not abuse his discretion by reversing the parole determination of the 2005 Board.[1]

On January 12, 2007, the trial court entered an order granting Gray's petition for a writ of habeas corpus. The trial court concluded that the Governor's reversal of the 2005 Board decision to grant parole was not supported by "some evidence." The trial court vacated the Governor's decision, and reinstated the Board's January 27, 2005 decision finding Gray suitable for parole. The trial court remanded the matter to the Governor to review the 2005 Board decision and to issue a new parole determination in accordance with due process.

Based solely upon the nature of the commitment offense, on February 8, 2007, the Governor again reversed the parole suitability determination of the 2005 Board. The Governor concluded that Gray was unsuitable for parole because his release would pose an unreasonable risk of danger to society. The Governor found that Gray's commitment offense was "especially heinous" based upon his findings that the murder was carried out in a cold and calculated manner and that there was evidence showing premeditation.

Gray filed a petition for a writ of habeas corpus in this court, asserting that the Governor abused his discretion and violated Gray's due process rights by reversing the 2005 decision of the Board finding Gray suitable for parole. Gray asserts that the Governor's decision is not supported by the "some evidence" standard set forth in *Rosenkrantz, supra,* 29 Cal.4th at page 626.

---

[1] In its order, the Supreme Court stated: "The matter is transferred to the Court of Appeal, Second District, Division Three. That court is ordered to vacate its summary denial dated November 2, 2005, and is further ordered to issue an order to show cause, returnable before the Los Angeles County Superior Court. The Director of Corrections and Rehabilitation is to be ordered to show cause, when the matter is placed on calendar, why the Governor did not abuse his discretion in reversing the January 27, 2005 decision of the Board of Parole Hearings finding [Gray] suitable for parole, why there was 'some evidence' in the record to support the Governor's determination made pursuant to article V, section 8(b) of the California Constitution and Penal Code section 3041.2, and why [Gray] is not entitled to release on parole. (See, *In re Dannenberg* (2005) 34 Cal.4th 1061, 1094–1095, 1098 [23 Cal.Rptr.3d 417, 104 P.3d 783]; *In re Rosenkrantz* (2002) 29 Cal.4th 616, 667, 683 [128 Cal.Rptr.2d 104, 59 P.3d 174]; *In re Scott* (2005) 133 Cal.App.4th 573, 597–601, 603 [34 Cal.Rptr.3d 905] [review den. Nov. 30, 2005]; *In re Smith* (2003) 114 Cal.App.4th 343, 366–367 [7 Cal.Rptr.3d 655]; *In re Smith* (2003) 109 Cal.App.4th 489, 505–507 [134 Cal.Rptr.2d 781] [review den. Sept. 24, 2003]; *In re Capistran* (2003) 107 Cal.App.4th 1299, 1306 [132 Cal.Rptr.2d 872].)"

■ We conclude that the Governor's decision's finding Gray unsuitable for parole is not supported by some evidence. There is no evidence in the record to support the Governor's findings that Gray's second degree murder was cold and calculating or premeditated. Thus, the crime was not "especially heinous" under the pertinent regulation. (Cal. Code Regs., tit. 15, § 2402, subd. (c)(1).)[2]

## FACTUAL AND PROCEDURAL BACKGROUND

In 1980, a jury found Gray guilty of second degree murder with the use of a firearm. (Pen. Code, §§ 187, subd. (a), 12022.5.) The trial court sentenced Gray to 15 years to life, but stayed the two-year term as to the use of the firearm. In 1990, Gray reached his minimum eligible parole date and became eligible for parole consideration.[3]

In 1993, 2001, and 2002, prior boards found Gray suitable for parole. In 1997, a prior board rescinded the 1993 parole suitability determination. In 2001, the Decision Review Unit of the Board disapproved the 2001 parole suitability determination. In 2002, former Governor Gray Davis reversed the 2002 parole suitability determination.

1. *In 2005, the Board Determined Gray Was Suitable for Parole*

Following a hearing, on January 27, 2005, a two-member panel of the Board found Gray suitable for parole. An attorney represented Gray at the hearing. The record before us consists, in part, of a transcript of the Board's proceedings.[4]

---

[2] Unless otherwise indicated, section references are to regulations contained in title 15 of the California Code of Regulations.

[3] Inmates serving an indeterminate sentence for second degree murder become eligible for parole consideration after serving the minimum terms of confinement. (*In re Dannenberg, supra,* 34 Cal.4th at p. 1078 (*Dannenberg*).) Two or more commissioners of the Board of Parole Hearings or the Board sitting en banc must normally set a parole release date before the inmate has served the minimum term, unless the inmate is found unsuitable for parole. (Pen. Code, § 3041, subd. (a); *Dannenberg,* at p. 1080.)

[4] Also included in the record before us are: (1) the Governor's June 16, 2005 written decision reversing the 2005 Board's determination of parole suitability; (2) the California Supreme Court's February 1, 2006 order transferring the matter to this court for the purposes of issuing an order to show cause (returnable in the superior court) as to why the Governor did not abuse his discretion in reversing the Board's January 27, 2005 decision finding Gray suitable for parole; (3) the superior court's January 12, 2007 order finding that the Governor's June 16, 2005 decision was not supported by the evidence, reinstating the Board's January 27, 2005 decision finding Gray suitable for parole, and remanding to the Governor; and (4) the Governor's February 8, 2007 decision in which he again reversed the Board's January 27,

At the commencement of the hearing, the presiding commissioner indicated the Board had reviewed, among other documents, Gray's "Central File," transcripts from prior parole hearings, as well as other unspecified documents. The presiding commissioner advised Gray that the purpose of the hearing was to determine whether Gray was suitable for parole. The Commissioner advised that Gray would be found unsuitable for parole "if in the judgment of the Panel the inmate would pose an unreasonable risk of danger to society if released from prison."

Below, we set forth in detail the contents of the transcript of the January 27, 2005 parole hearing.

### a. *Gray's Background and Prior Criminal History*

Gray graduated from Whittier College in 1973. He received a bachelor of arts degree in political science, with a minor degree in business administration. Gray was working for the Post Office at the time of the incident.

Gray had no juvenile record and no other offenses as an adult.

### b. *The Commitment Offense*

At the 2005 hearing, the presiding officer explained to Gray that she would read into the record a summary of the commitment offense from the April 2003 report of the Board. She further explained that Gray would then have the opportunity to explain what happened in his own words. The presiding commissioner read the following statement into the record:

" 'On 7-30-79 victim Ronnie Waddell . . . , age 32, was shot to death by Henry Gray, age 27 . . . . The victim was an acquaintance to Gray through Gray's wife, Jacqueline Gray, the former Jacqueline Waddell.

" 'On 7-30-79 officers of the Hawthorne Police Department responded to a radio call to assist the fire department in responding to a victim of a gunshot wound . . . . Upon arrival, officers observed the victim, Ronnie Waddell, lying in a pool of blood in the driveway—blood appeared to be from a gunshot wound to the lower right cheek. Waddell was transported to Hawthorne Community Hospital where he was pronounced dead on arrival.

---

2005 parole determination. In addition, at the 2005 hearing, the presiding commissioner read into the record former Governor Davis's August 30, 2002 written statement reversing the 2002 grant of parole.

" 'Officers at the scene were approached by Jacqueline Gray, Henry Gray's wife. She relayed information that her husband shot Ronald Waddell, Jacqueline's ex-husband, with a handgun that she believed he had (inaudible) in a nearby yard. She informed the officers she last saw her husband driving his vehicle westbound on Broadway.

" 'Mrs. Gray relayed information to the officers of events leading to the shooting. Earlier that day while at her employment . . . on Wilshire Boulevard, Los Angeles, her husband approached her and demanded the keys to her 1978 Ford Thunderbird. She claimed her husband struck her in the face causing a black eye, then left, taking the vehicle that was registered in both of their names. She claims she was in the process of obtaining a divorce and was living with her ex-husband, the victim.

" 'At approximately 6:30 she left work and went to a motel room she shared with Ronald Waddell. She claimed that at approximately eight o'clock Ronald came home, saw the black eye and became angry. She claimed Ronald obtained her husband's phone number and called him. After a short conversation, she claims Ronald told her to accompany him to her husband's home to pick up the keys. When they arrived at her husband's home, Ronald parked near a phone booth and made two attempts to call Gray. When Ronald observed Gray outside the home, she stated she accompanied Ronald when he confronted her husband. She claims after a short conversation her husband returned the keys, then Ronald stated quote "this shit is bad about you going to her—to her job to beat her up" end quote.

" 'Jacqueline claimed she tried to get Ronald to leave then, saying, let's go. She claimed Ronald was going to teach her husband a lesson and Ronald started towards Gray. Gray pulled a revolver from his back pocket and Ronald stated, that little gun isn't going to scare me. Jacqueline claims at that time one shot was fired and Ronald fell to the ground. Gray turned himself into the Hawthorne Police Department the following day while accompanied by his attorney.' "

The presiding commissioner then permitted Gray to state what happened in his own words. Gray stated the following: "That's exactly what happened pretty much in that I was called at work and she informed me she needed some money. And this had been going on for a few weeks. We had separated about four weeks earlier. . . . And so when I arrived at her place of employment, during the course of the conversation I informed her that she had to stop because the way things were going we might as well reconcile and get back together because the separation wasn't a separation, it was

actually just a means of being apart. At that time that's when she told [me] she wasn't using the money for herself, that she was giving it to Ronnie. I guess—I guess my ego took over and I did slap her."

Gray continued his testimony before the 2005 Board: "At that time she gave me the keys to the '78 Thunderbird and I told her that I would bring her the keys to the '79 Fiat the next day. Later on that night when I had woken up, getting ready to go to work, is when I got the phone call from Ronnie. And as you can read in the probation officer's report, he made some statements, some threats, and I guess at the time in my mind I took the threats literally, yes, I did. And so I called my younger brother, my only brother, and I told him I was coming over to his house and that's why I was outside. I didn't receive any more phone calls from Ronnie and so—I guess I'm moving ahead to elude to the fact that I didn't know that they were outside my house. And so when I saw him approaching me, I took the car keys and the conversation ensued about it being bad that I went to her job and he was going to teach me a lesson. Again I said, how can you teach me anything, I'm a college graduate, you never graduated from high school, and we did the little back and forth with the words and that's when Jackie (indiscernible) the part about, let's go, I've got the keys. And that's when he said he was going to teach me the lesson. He made movements and I shot him. I know I've left out some things that also transpired as to why I shot—and that was the fact that Jackie had told me that the guns that she had—she did say she had pawned it but at the same time she said she'd given the stuff to Ronnie. So I didn't know what to believe."

In response to questions from the presiding commissioner, Gray testified that he thought that Ronald Waddell had a gun. Gray explained the basis for his belief: "The motions that he made coming at me, the statement, this little gun's not going to scare me, the fact that he had told me I was a walking dead man, he knew where I worked, he knew where I played ball, [and] he knew what days I practiced . . . ." Gray acknowledged that he later learned that Ronald Waddell was not armed.

Gray told the 2005 Board that he did not just go back into the house when Waddell threatened him because he was in the middle of the street, getting ready to get into his car. Gray then explained to the Board how his mother helped him find an attorney, with whom Gray turned himself into the police the following day.

The presiding commissioner then asked Gray what was different today from when he committed the offense. Gray explained that he was no longer an arrogant 28 year old, that his ego played a role in the commitment offense, and that he learned that it was easier to make way for people rather than making them move out of the way.

Based upon the fact that the victim, Waddell, had made threats to Gray the day of the offense, the deputy commissioner asked Gray why he had a gun on the day in question. Gray responded that he did not expect Waddell and his wife to be outside his house, and that he was going to take the gun to his brother's house before work.

As to why he pulled his gun, Gray testified: "He's coming toward me, Jackie grabs him on the left arm so to speak and in his jerking motion from her and—I don't know, I guess this is 25 years, 26 years later, I can say that I reacted too soon. But the way the incident occurred and the sequence of events that took place with her grabbing him and him jerking away and him coming at me, it's all a matter of that 10 to 15 seconds that has ruined a lot of lives by me being stupid . . . . "

In response to questioning from the district attorney, Gray discussed his remorse, stating: "The remorse and amends I try to make is through the actions that I'm taking within the prison setting by having others go out and try to change the lifestyle that they're living and not get involved with the same type of thing that led to my life crime because we have a lot of guys that come up here and feel that the world also owes them something." Gray added that he had contact with a stepson, though whom he expressed remorse to Jackie, his former wife.

### c. *Conduct While Incarcerated*

The deputy commissioner summarized Gray's record in prison. She explained that Gray had three "CDC 115's," the last one on July 24, 1989; and he had seven "CDC 128's," the last one on August 14, 1989. According to the California Code of Regulations, a CDC 115 documents misconduct believed to be a violation of law which is not minor in nature. A form 128 documents incidents of minor misconduct. (See § 3312, subd. (a)(2) & (3).)

Specifically, while incarcerated, Gray was arrested twice in 1981 and 1987 for possession of marijuana. About his use of marijuana, Gray testified he started smoking marijuana in college in 1969. He continued to smoke marijuana until 1991. Gray testified that he ceased using marijuana following the 1991 denial of parole. He testified that he realized that marijuana was associated with all of his problems and that it was "holding [him] back." Gray changed his circle of friends in prison.

While in prison, Gray participated in Narcotics Anonymous (NA) and Alcoholics Anonymous (AA). The deputy commissioner noted that Gray received a number of laudatory "chronos" or evaluations, for participation in NA and AA, including: (1) two NA certificates of completion for the 1997-to-

2004 time period; (2) a "Working The 12-Steps" certificate of completion dated January 2004, showing that Gray had completed the 12-Step NA substance abuse program; (3) three AA certificates of completion for the 1997-to-2004 time period; and (4) a September 2003 document showing completion of a three-step program from "Drug Free & Proud."

During his incarceration, Gray completed office machine repair and sewing machine repair trade classes. Since his last parole hearing in 2002, Gray also participated in a number of courses in filing, typing, job preparation, intermediate typing, electronic calculation, Windows MT, advanced typing, business math, light industry, education, bookkeeping, recordkeeping and accounting. He had certificates of completion in proofreading, punctuation, and spelling.

At the time of the 2005 parole hearing, Gray worked as a clerk in the prison office services, where he had worked since February 2004. Gray's vocational instructor gave him two laudatory chronos. There, the vocational instructor commended Gray for his work as a clerk, stating he was a valuable asset to the program due to prior experience and suggestions. In addition, a plant manager also gave Gray a laudatory chrono.

Gray's file also contained: (1) chronos dated April 2002 and June 2002, showing that he worked as a teacher's aide and received above-average grades; (2) two laudatory chronos authored by Gray's academic teacher with respect to a program called "Pre-Release Reentry," in which the academic teacher praised Gray for speaking "at each one of the graduating classes to try and give them some motivation and some information with regard to going back out in the community;" (3) an August 2004 laudatory chrono from Chaplain Navarro commending Gray "for being an asset to the class in Reentry;" and (4) a July 2004 laudatory chrono from Chaplain Parker for completion of 13 months in the biblical self-confrontation course, and for successful completion of all 23 lessons in the biblical self-confrontation course.

In addition, Gray's file contained: (1) a 2004 certificate of completion for the biblical self-confrontation class; (2) a 2003 certificate of completion for an associate of religious education; (3) a 2003 certificate of achievement for biblical interpretation and a letter from the Crossroads Biblical Institute congratulating Gray for completion of a three-tier course in biblical interpretation; and (4) college transcripts showing Gray's participation in programs related to the Family Radio School of Bible, from which Gray received a degree.

### d. *Mental Health Factors*

The deputy commissioner summarized Gray's psychiatric report. In May 2003, Dr. Bob Ohrling prepared a report concerning Gray. The report stated

that Gray's financial and vocational plans for release were excellent, Gray's level of support from the community was good, and Gray's prior work history and institutional adjustment were excellent.

As for assessment of dangerousness, Dr. Ohrling noted that Gray had a number of low-risk factors, including the fact that he had no prior record. The doctor explained that drugs and alcohol were not a problem in the offense, and that he had no record of aggression or violence in prison. As additional low risk factors, Dr. Ohrling noted Gray's long-term participation in AA and NA, the fact that Gray took responsibility for the offense, the fact that Gray did not rationalize or minimize his role, and that he had shown remorse. The doctor wrote that Gray was able to reflect upon the circumstances and situations leading up to the offense, and that Gray has been able to accept responsibility for his shortcomings and impulsive and explosive behavior.

As for high risk factors, the doctor noted that Gray did have a history of drug and alcohol abuse and that the commitment offense resulted in death.

Dr. Ohrling concluded that Gray did not have a major mental disorder, personality disorder, or substance abuse problem. He concluded that Gray was not in need of any treatment, but noted that Gray would be amenable to treatment if suggested.

Dr. Ohrling wrote that Gray had demonstrated "remarkable change" in his behavior since incarceration. Gray had received no discipline for 14 years, he had numerous laudatory chronos, he had participated in self-help groups and religious courses, and he had received an associate of arts degree. The doctor further wrote that Gray had gained insight into the inherent dangers of firearms and violence. He concluded: "In a less controlled setting such as a return to the community[,] the inmate would be considered likely to hold his present gains." The doctor further concluded that Gray's violence potential was less than the average inmate and no greater than the average citizen in the community.

e. *Plans for the Future*

If released from prison, Gray testified that he had plans to reside at "On the Right Road to Recovery," a sober-living center located in Los Angeles. Gray noted that if he applied in person, the Salvation Army would provide him with accommodations, but could not hold a bed for him while in prison.

As for employment, Gray testified that he had a job offer with a company called "Delta Distributors." Gray also explained that a long-term friend, a

former postmaster, who had provided letters of support, offered to involve Gray with his McDonald's restaurant business.

### f. *Issues Raised by Former Governor Davis's 2002 Reversal of Parole*

In 2002, former Governor Davis reversed the Board's 2002 decision finding Gray suitable for parole. The presiding commissioner at the 2005 hearing read the Governor's 2002 written statement into the record.

There, Governor Davis wrote that Gray had provided inconsistent statements as to why he was armed on the evening in question. According to the presiding commissioner, Governor Davis wrote the following: "With a loaded weapon, he confronted Mr. Waddell, eliminating the possibility of resolving the dispute peacefully. Mr. Gray claimed that he carried the loaded weapon for protection, but the evidence showed that Mr. Waddell was unarmed. . . . Mr. Gray has demonstrated an inability to accept responsibility for the offense by changing his reason for carrying a loaded gun. At the 2002 parole suitability hearing, Mr. Gray denied that he was fearful of Mr. Waddell. He claimed that he was taking the gun to his brother's house for safekeeping. The District Attorney, who was troubled by the different explanations, confronted him with the inconsistencies. When asked which version was true, Mr. Gray failed to resolve the conflict."

Governor Davis also wrote that Gray had not come to terms with his history of drug use based upon Gray's 1998 statement that his drug use was not extensive or abusive. Governor Davis noted that in 1999, a parole board commissioner had opined that Gray had not sufficiently participated in self-help and therapy to address the history of marijuana use.

In addition, Governor Davis noted that the Board rescinded Gray's parole date in 1997 because Gray had filed a false financial statement with Internal Revenue Service. The district attorney questioned Gray about this during the 2002 parole hearing. The Governor wrote that Gray's attempt to explain the incident by stating that his supervisor okayed the financial statement was an attempt to displace responsibility for his action.

Governor Davis questioned Gray's acceptance of full responsibility for the commitment offense. Based upon the false financial statement incident, Governor Davis questioned Gray's ability to function within the law. He was also concerned about Gray's level of participation in self-help programs such as NA and AA.

Governor Davis expressed concern about Gray's plans after release. In 2002, if released, Gray intended to live with his mother or sister. At the 2002

parole hearing, the district attorney questioned Gray about his plans and informed Gray that he could not live with his mother or sister, because his mother was a convicted felon and his sister was on parole for a drug violation. Gray testified he never knew about the convictions. Governor Davis noted that the district attorney was incredulous that Gray did not know about these convictions.

During the 2005 parole hearing, the presiding commissioner asked Gray about the concerns raised by Governor Davis. Gray responded to their questions as follows. He began participating in a substance abuse program in 1990. He explained that he participated nonstop in AA and NA until 1992, but then became involved with a program called ESPEJO, a community outreach program involving drugs, crime and life in prison. Gray testified that he could not participate in as many NA meetings when he was involved with ESPEJO.

Gray further explained that in 1997, he began participating in NA, and was also serving as a chapel clerk. At that time, according to Gray, the chapel clerk schedule conflicted with the NA schedule. Gray testified that after receiving the Governor's 2002 letter reversing the parole decision, he minimized his involvement in the chapel program to increase his involvement in NA and AA.

The presiding commissioner then asked Gray why he had a gun on the night in question. Gray responded that he started carrying the gun on the day of the shooting, but acknowledged that it was loaded. He also testified: "I believed, at the time, because of the things that Ronnie had said that that day might come when he and I would again run into each other. It would be ludicrous to say that there's no fear involved because then I would just be trying to be macho. So fear had to have been a factor, whether minimal or great, but I was intending to take the gun to my brother's house. . . . And running into Ronnie and Jackie outside just—I guess it escalated the thought pattern that I had at the time that he might have the gun that I had left with Jackie."

With respect to the incident involving false financial statements, Gray explained that he appealed the prison discipline which resulted from this incident and prevailed. It is undisputed that any prison discipline related to this incident was dismissed. (Governor Schwarzenegger did not rely upon this incident in finding Gray unsuitable for parole.)

At the 2005 parole hearing, the presiding commissioner asked Gray about his mother and sister. Gray reiterated his prior testimony that he did not know about the convictions until the district attorney questioned him during the

2002 parole hearing. Gray further testified that his mother was incarcerated for two months during Gray's period of incarceration because she had written a bad check.

Gray acknowledged that his sister had served time in Texas. The 2005 Board did not question Gray further with respect to his sister's offense.

### g. Support for and Opposition to Parole

The presiding commissioner identified Gray's letters of support on the record. In addition to the letter regarding employment from his friend, Mr. Porter, the commissioner identified a letter from Frederick McNeil, Gray's sister's first husband. In the letter, McNeil offered Gray a place to live. There was an additional letter of support from a Mr. W. Wing, but the Commissioner did not identify the contents of the letter. The district attorney argued that Gray was not suitable for parole.

### h. The Board's 2005 Decision

After hearing argument from the district attorney and counsel for Gray, the Board found Gray suitable for parole, concluding that he would not pose an unreasonable risk of danger to society if released from prison.

The presiding commissioner noted the following: Gray had no prior criminal record. He had a stable social history and while in prison, Gray enhanced his ability to function within the law by participating in various educational, religious and vocational programs. Gray was older, more mature, and showed a greater understanding of the issues that led to the commitment offense.

The Board concluded that Gray had a reduced possibility of recidivism. Gray had suitable plans for parole, had maintained his family ties, had positive institutional behavior, and showed appropriate signs of remorse.

Gray had positive psychiatric evaluations. In 2003, Dr. Ohrling found Gray's propensity for violence was no greater than the average citizen and that Gray demonstrated remarkable change in his behavior since incarceration. In 1998, Dr. Hansink conducted a psychological evaluation of Gray. Dr. Hansink noted that following the decision rescinding the 1997 release date, Gray accepted and worked with that decision in a way that reflected maturity and humility.

### 2. The Governor Reverses Parole Suitability Determination

On June 16, 2005, the Governor reversed the Board's grant of parole. The Governor (Schwarzenegger) explained in a written decision that, based upon

the nature of the commitment offense and Gray's prison record, Gray would pose an unreasonable risk of danger to society if released from prison.

### 3. *Gray Files a Petition for Writ of Habeas Corpus*

Gray then filed a petition for writ of habeas corpus in the superior court on August 4, 2005. The superior court denied the writ. In response, Gray filed a writ for habeas corpus with this court, which was summarily denied on November 2, 2005.

On February 1, 2006, the California Supreme Court transferred this matter to this court. The Supreme Court ordered this court (1) to vacate the November 2, 2005 summary denial of the petition for a writ of habeas corpus, and (2) to issue an order to show cause returnable before the superior court as to why the Governor's June 16, 2005 decision to reverse the grant of parole was not an abuse of discretion.

### 4. *The Superior Court Vacates the Governor's 2005 Decision*

On January 12, 2007, the superior court issued a written order granting Gray's petition for a writ of habeas corpus. The trial court concluded that the Governor's statement that the crime showed "exceptional callousness" was not supported by the record.[5] The court also concluded that Gray's prison record did not constitute "some evidence" sufficient to deny parole.

The trial court ordered the Governor to vacate the 2005 decision reversing the Board's parole suitability determination. The court ordered the Board's 2005 parole suitability determination reinstated and concluded that "the Governor, at his discretion, may review the Board's decision and issue a new determination under his constitutional and statutory authority and in accordance with the requirements of due process."

---

[5] The trial court explained: "The fact that [Gray] caused the death does not make the murder exceptional. Although *all* second degree murders by definition involve some callousness [citation], the evidence in this case does not show any 'exceptional' callousness sufficient to aggravate the commitment offense to one where '[t]he prisoner committed the offense in an especially heinous, atrocious or cruel manner' as defined under the law. [Citation.] [¶] Nor does the record demonstrate that . . . the 'violence and viciousness of the inmate's crime' is greater than that which is '*minimally necessary to convict* [the defendant] of the offense for which he is confined.' [Citations.] . . . When the [Governor] bases unsuitability on the circumstances of the commitment offense, [he] must cite "some evidence" of aggravating facts *beyond the minimum elements of that offense.*' [Citation.] [¶] Nothing in this scenario describing the commitment offense suggests that [Gray's] offense was more than the minimum necessary for a conviction of second degree murder." (Original italics.)

5. *In 2007, the Governor. Issues New Determination Again Reversing the Board's Finding That Gray Was Suitable for Parole*

On February 8, 2007, the Governor issued a new written decision again reversing the Board's parole suitability determination. After setting forth a brief procedural history, the Governor summarized the commitment offense— the shooting of Gray's estranged wife's ex-husband, 32-year-old Ronald Waddell. The Governor explained that he was reversing the Board's 2005 parole suitability determination based solely upon the nature of the crime.

The Governor explained why the commitment offense was sufficient to reverse the Board's 2005 determination of parole suitability: "Despite the positive factors I considered, the second-degree murder for which Mr. Gray was convicted was especially heinous because of the cold and calculated manner in which it was carried out. In addition, his actions suggest that the murder was committed after some level of premeditation, making it more egregious than the minimum elements necessary to sustain a conviction for second-degree murder. According to the probation report, Mr. Waddell telephoned Mr. Gray first, [and] then came over. Mr. Gray had the gun with him when Mr. Waddell arrived. According to his wife's statement to police, after Mr. Gray returned the keys to Mr. Waddell, Mr. Waddell made a comment about the incident earlier that day, where Mr. Gray struck his wife in the face. Mr. Gray then 'pulled his .38 caliber revolver from his pants pocket, extended it at arm's length, holding it with both hands and pointed it towards victim Waddell's face.' Mr. Gray admitted to the 2005 Board that Mr. Waddell was unarmed at the time. According to his wife's statement, Mr. Waddell simply said, '[t]hat gun doesn't scare me,' and Mr. Gray shot him in the face. Even considering Mr. Gray's present gains, the gravity of the second-degree murder perpetrated by Mr. Gray is alone sufficient for me to conclude that his release from prison would pose an unreasonable public-safety risk at this time."

As to the nature of the commitment offense, the Governor also wrote: "I note that the Los Angeles County District Attorney's Office registered opposition with the 2005 Board based, in part, on the gravity of the offense. The district attorney's office also opposed Mr. Gray's parole with the 2006 Board. Additionally, the 2006 Board found Mr. Gray unsuitable for parole based on the gravity of his offense. In part, the Board found that Mr. Gray's motive for the crime 'was simply inexplicable.' "

The Governor concluded: "At age 55 now, after being incarcerated for more than 25 years, Mr. Gray continues to make creditable gains in prison, including accepting responsibility for his actions and expressing remorse. But given the current record before me, and after carefully considering the very

same factors the Board must consider, I find that the gravity of the murder perpetrated by Mr. Gray presently outweighs the positive factors. Accordingly, because I believe his release would pose an unreasonable risk of danger to society at this time, I REVERSE the Board's 2005 decision to grant parole to Mr. Gray."

### 6. *The Present Petition for Writ of Habeas Corpus*

On March 7, 2007, Gray filed the present petition for a writ of habeas corpus in this court. There, he asserted that the Governor's second reversal of the Board's determination of parole suitability was not supported by some evidence. Gray also asserted that the Governor abused his discretion and violated Gray's due process rights by again reversing the Board's 2005 parole suitability determination.

## ISSUE PRESENTED

The issue presented is whether the Governor's February 8, 2007 decision finding Gray unsuitable for parole is supported by "some evidence." (*Rosenkrantz, supra,* 29 Cal.4th at p. 626.)

## STANDARD OF REVIEW

We review the Governor's decision to determine if it is supported by "some evidence." (*Rosenkrantz, supra,* 29 Cal.4th at p. 626.) The *Rosenkrantz* court explained: "Article V, section 8(b), requires that a parole decision by the Governor pursuant to that provision be based upon the same factors the Board is required to consider. Due process of law requires that this decision be supported by *some evidence* in the record. Only a modicum of evidence is required. Resolution of any conflicts in the evidence and the weight to be given the evidence are matters within the authority of the Governor. As with the discretion exercised by the Board in making its decision, the precise manner in which the specified factors relevant to parole suitability are considered and balanced lies within the discretion of the Governor, but the decision must reflect an individualized consideration of the specified criteria and cannot be arbitrary or capricious. It is irrelevant that a court might determine that evidence in the record tending to establish suitability for parole far outweighs evidence demonstrating unsuitability for parole. As long as the Governor's decision reflects due consideration of the specified factors as applied to the individual prisoner in accordance with applicable legal standards, the court's review is limited to ascertaining whether there is some evidence in the record that supports the Governor's decision." (*Rosenkrantz, supra,* at pp. 676–677, italics added.)

## DISCUSSION

### 1. *Introduction to Parole Suitability Determinations*

#### a. *The Board Determines Parole Suitability in the First Instance*

■ The Board makes determinations of parole suitability in the first instance for inmates serving indeterminate life sentences. (*Rosenkrantz, supra,* 29 Cal.4th at p. 653.) "The Board has broad discretion, must normally set parole release in a manner that provides uniform terms for offenses of similar gravity and magnitude with respect to the public safety [citations], and must set a parole release date unless it determines that the gravity of the current convicted offense or offenses, or their timing and gravity, are such that public safety requires a more lengthy period of incarceration [citations]." (*In re Elkins* (2006) 144 Cal.App.4th 475, 487 [50 Cal.Rptr.3d 503]; see Pen. Code, § 3041, subds. (a) & (b).)[6]

Penal Code section 3041, subdivision (a), directs the Board to establish criteria for the setting of parole release dates. The Board's criteria for setting parole release dates for individuals convicted of murder committed after 1978 are set forth in section 2400 et seq. of the regulations. (*Rosenkrantz, supra,* 29 Cal.4th at p. 653.)

Subdivision (a) of section 2402 provides: "General. The panel shall first determine whether the life prisoner is suitable for release on parole. Regardless of the length of time served, a life prisoner shall be found unsuitable for and denied parole if in the judgment of the panel the prisoner will pose an unreasonable risk of danger to society if released from prison."

---

[6] Penal Code section 3041 provides in pertinent part: "(a) . . . One year prior to the inmate's minimum eligible parole release date a panel of two or more commissioners or deputy commissioners shall again meet with the inmate and shall normally set a parole release date . . . . The release date shall be set in a manner that will provide uniform terms for offenses of similar gravity and magnitude in respect to their threat to the public, and that will comply with the sentencing rules that the Judicial Council may issue and any sentencing information relevant to the setting of parole release dates. The board shall establish criteria for the setting of parole release dates and in doing so shall consider the number of victims of the crime for which the inmate was sentenced and other factors in mitigation or aggravation of the crime. . . . [¶] (b) The panel or the board . . . shall set a release date unless it determines that the gravity of the current convicted offense or offenses, or the timing and gravity of current or past convicted offense or offenses, is such that consideration of the public safety requires a more lengthy period of incarceration for this individual, and that a parole date, therefore, cannot be fixed at this meeting."

### (i) The Board Must Consider Certain Factors When Determining Parole Suitability

 Subdivision (b) of section 2402 directs the Board to consider "[a]ll relevant, reliable information available to the panel . . . in determining suitability for parole. Such information shall include [(1)] the circumstances of the prisoner's social history; [(2)] past and present mental state; [(3)] past criminal history, including involvement in other criminal misconduct which is reliably documented; [(4)] the base and other commitment offenses, including behavior before, during and after the crime; [(5)] past and present attitude toward the crime; [(6)] any conditions of treatment or control, including the use of special conditions under which the prisoner may safely be released to the community; and [(7)] any other information which bears on the prisoner's suitability for release. Circumstances which taken alone may not firmly establish unsuitability for parole may contribute to a pattern which results in a finding of unsuitability."

### (ii) Circumstances Tending to Show Unsuitability for Parole

Subdivision (c) of section 2402 sets forth six factors tending to show unsuitability for parole, which include:

"(1) Commitment Offense. The prisoner committed the offense in an especially heinous, atrocious or cruel manner. The factors to be considered include:

"(A) Multiple victims were attacked, injured or killed in the same or separate incidents.

"(B) The offense was carried out in a dispassionate and calculated manner, such as an execution-style murder.

"(C) The victim was abused, defiled or mutilated during or after the offense.

"(D) The offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering.

"(E) The motive for the crime is inexplicable or very trivial in relation to the offense.

"(2) Previous Record of Violence. The prisoner on previous occasions inflicted or attempted to inflict serious injury on a victim, particularly if the prisoner demonstrated serious assaultive behavior at an early age.

"(3) Unstable Social History. The prisoner has a history of unstable or tumultuous relationships with others.

, "(4) Sadistic. Sexual Offenses. The prisoner has previously sexually assaulted another in a manner calculated to inflict unusual pain or fear upon the victim.

"(5) Psychological Factors. The prisoner has a lengthy history of severe mental problems related to the offense.

"(6) Institutional Behavior. The prisoner has engaged in serious misconduct in prison or jail."

(iii) *Circumstances Tending to Show Suitability for Parole*

Subdivision (d) of section 2402 sets forth nine factors tending to show suitability for parole, which include:

"(1) No Juvenile Record. The prisoner does not have a record of assaulting others as a juvenile or committing crimes with a potential of personal harm to victims.

"(2) Stable Social History. The prisoner has experienced reasonably stable relationships with others.

"(3) Signs of Remorse. The prisoner performed acts which tend to indicate the presence of remorse, such as attempting to repair the damage, seeking help for or relieving suffering of the victim, or indicating that he understands the nature and magnitude of the offense.

"(4) Motivation for Crime. The prisoner committed his crime as the result of significant stress in his life, especially if the stress has built over a long period of time.

"(5) Battered Woman Syndrome. At the time of the commission of the crime, the prisoner suffered from Battered Woman Syndrome . . . .

"(6) Lack of Criminal History. The prisoner lacks any significant history of violent crime.

"(7) Age. The prisoner's present age reduces the probability of recidivism.

"(8) Understanding and Plans for Future. The prisoner has made realistic plans for release or has developed marketable skills that can be put to use upon release.

"(9) Institutional Behavior. Institutional activities indicate an enhanced ability to function within the law upon release."

*Rosenkrantz* explains that "[i]n sum, the governing statute provides that the Board must grant parole unless it determines that public safety requires a lengthier period of incarceration for the individual because of the gravity of the offense underlying the conviction. (Pen. Code, § 3041, subd. (b).) And as set forth in the governing regulations, the Board must set a parole date for a prisoner unless it finds, in the exercise of its judgment after considering the circumstances enumerated in section 2402 of the regulations, that the prisoner is unsuitable for parole. [Citation.] Accordingly, parole applicants in this state have an expectation that they will be granted parole unless the Board finds, in the exercise of its discretion, that they are unsuitable for parole in light of the circumstances specified by statute and by regulation." (*Rosenkrantz, supra,* 29 Cal.4th at p. 654.)

### b. *The Constitution Authorizes the Governor to Review the Parole Decisions of the Board*

Article V, section 8, subdivision (b) of the California Constitution authorizes the Governor to review the Board's parole decisions in murder cases with indeterminate terms "subject to procedures provided by statute."[7] The *Rosenkrantz* court explained that pursuant to the constitutional and statutory authority to review parole determinations, the Governor is to undertake an "independent, de novo" review of the inmate's suitability for parole, but that the Governor's review "is limited to the same considerations that inform the Board's decision." (*Rosenkrantz, supra,* 29 Cal.4th at pp. 660–661; see Pen. Code, § 3041.2, subd. (a).)

### 2. *The Governor Improperly Relied Upon Evidence Not Before the 2005 Board*

Penal Code section 3041.2, subdivision (a), provides that when reviewing parole determinations, the "Governor . . . *shall* review materials provided by the parole authority." (Italics added.)[8]

---

[7] Article V, section 8, subdivision (b) of the state Constitution, provides: "No decision of the parole authority of this state with respect to the granting, denial, revocation, or suspension of parole of a person sentenced to an indeterminate term upon conviction of murder shall become effective for a period of 30 days, during which the Governor may review the decision subject to procedures provided by statute. The Governor may only affirm, modify, or reverse the decision of the parole authority on the basis of the same factors which the parole authority is required to consider. The Governor shall report to the Legislature each parole decision affirmed, modified, or reversed, stating the pertinent facts and reasons for the action."

[8] Penal Code section 3041.2, subdivision (a), provides: "During the 30 days following the granting, denial, revocation, or suspension by a parole authority of the parole of a person

In *In re Smith, supra*, 109 Cal.App.4th 489, review denied September 24, 2003 (*Smith I*), former Governor Davis relied upon letters from the sheriff's department in finding that Smith was not suitable for parole. The court stated that the letters were not before the Board and could not constitute evidence in support of the Governor's decision. (*Id.* at p. 505.) The court explained pursuant to Penal Code section 3041.2, subdivision (a), that "[a]lthough the *Board* can give the prisoner a new hearing and consider additional evidence, the *Governor's* constitutional authority is limited to a review of the materials provided by the Board." (*Smith I, supra*, at p. 507; see also *In re Scott, supra*, 133 Cal.App.4th at p. 602, review den. Nov. 30, 2005 (*Scott*).)

In this case, the Governor's February 8, 2007 decision finding Gray unsuitable for parole shows that the Governor relied upon evidence which was not before the 2005 Board, including, (1) the district attorney's opposition to Gray's parole before the 2006 Board, and (2) the 2006 Board's finding that Gray was unsuitable for parole based upon the gravity of the offense because the motive for the crime was " 'simply inexplicable.' "

The proceedings before the 2006 Board were not part of the 2005 Board proceedings or the record presented to the Governor for review. In reviewing the 2005 Board decision, the Governor erred by considering evidence presented to the 2006 Board, as well as the findings of the 2006 Board. This evidence does not constitute some evidence to reverse the 2005 Board's determination that Gray was suitable for parole. We therefore review the Governor's reversal of the 2005 Board's parole suitability determination without consideration of this evidence.

3. *The Governor's Decision Finding Gray Not Suitable for Parole Is Not Supported by Any Evidence*

a. *Introduction*

Excluding the Governor's reliance upon proceedings which occurred before the 2006 Board, the Governor's February 8, 2007 written decision reversing the grant of parole shows that the Governor relied solely upon the commitment offense to find Gray unsuitable for parole. We conclude that the Governor's decision is not supported by "some evidence."

We note that there is no dispute that all other applicable regulatory criteria indicate that Gray is suitable for parole. Gray has no juvenile or adult record. He has a stable social history and has shown remorse. His psychological

---

sentenced to an indeterminate prison term based upon a conviction of murder, the Governor, when reviewing the authority's decision pursuant to subdivision (b) of Section 8 of Article V of the Constitution, *shall review materials provided by the parole authority*." (Italics added.)

evaluation indicates his future violence potential is low. His age reduces the probability of recidivism. He has realistic plans for release. His activities while incarcerated show that he has an enhanced ability to function within the law.[9] He does not have a substance abuse problem. In addition, the record shows that Gray committed the crime as a result of significant stress in his life.

 b. *Gray's Commitment Offense Was Not Especially Heinous, Atrocious or Cruel, and Did Not Include Elements More Than Reasonably Necessary to Convict Him of the Second Degree Murder*

 (i) *For Second Degree Murder, Parole Is the Rule, Not the Exception*

In *Rosenkrantz*, the Supreme Court explained that denial of parole can be based upon the nature of the commitment offense. (*Rosenkrantz, supra*, 29 Cal.4th at p. 683.) The court cautioned, however, that "a denial of parole based upon the nature of the offense alone might rise to the level of a due process violation—for example where no circumstances of the offense reasonably could be considered more aggravated or violent than the minimum necessary to sustain a conviction for that offense. Denial of parole under these circumstances would be inconsistent with the statutory requirement that a parole date normally shall be set 'in a manner that will provide uniform terms for offenses of similar gravity and magnitude in respect to their threat to the public. . . .' [Citation.] 'The Board's authority to make an exception [to the requirement of setting a parole date] based on the gravity of a life term inmate's current or past offenses should not operate so as to swallow the rule that parole is "normally" to be granted. Otherwise, the Board's case-by-case rulings would destroy the proportionality contemplated by Penal Code section 3041, subdivision (a), and also by the murder statutes, which provide distinct terms of life without possibility of parole, 25 years to life, and 15 years to life for various degrees and kinds of murder. (Pen. Code, § 190 et seq.) [¶] Therefore, *a life term offense or any other offenses underlying an indeterminate sentence must be particularly egregious to justify the denial of a parole date.*' " (*Rosenkrantz*, at p. 683, italics added.)[10]

---

[9] In the February 8, 2007 decision, the Governor set forth his understanding of Gray's prison record. Nowhere, however, in the February 8, 2007 decision does the Governor appear to rely upon Gray's prison record as a factor supporting his conclusion that Gray is not suitable for parole.

[10] In *Dannenberg, supra*, 34 Cal.4th 1061, the Supreme Court provided additional explanation as to when a commitment offense alone is sufficient to deny parole. Specifically, the *Dannenberg* court explained when a commitment is "particularly egregious" under *Rosenkrantz* to deny parole. The *Dannenberg* court stated: "Our discussion [in *Rosenkrantz*],

■ "[T]he Regulations reveal that the gravity of an offense tends to show unsuitability where the circumstances of the crime distinguish it as *especially grave.*" (*In re Smith, supra,* 114 Cal.App.4th at p. 366 (*Smith II*), second italics added.) "[P]arole is the rule, rather than the exception, and a conviction for second degree murder does not automatically render one unsuitable." (*Ibid.*)

In *In re Lee* (2006) 143 Cal.App.4th 1400 [49 Cal.Rptr.3d 931] (*Lee*), the court explained: "The measure of atrociousness is not general notions of common decency or social norms, for by that yardstick all murders are atrocious. [Citation.] [' "[A]ll second degree murders by definition involve some callousness—i.e., lack of emotion or sympathy, emotional insensitivity, indifference to the feelings and suffering of others" '].) *Rather, the inquiry is whether among murders the one committed by [the inmate] was particularly heinous, atrocious or cruel.*" (*Id.* at p. 1409, italics added.)

To guide the Governor's determination of whether a second degree murder is "particularly egregious" (in the words of the *Rosenkrantz* court), "especially grave" (in the words of the *Smith II* court), or "particularly heinous" (in the words of the *Lee* court) section 2402, subdivision (c)(1) of the regulations requires the Governor to determine, based upon reliable evidence, whether the crime was committed "in an especially heinous, atrocious or cruel manner." To elucidate what that phrase means, the regulations provide "factors to be considered" including the factor relied upon by the Governor in this case: whether "[t]he offense was carried out in a dispassionate and calculated manner, such as an execution-style murder." (§ 2402, subd. (c)(1)(B).)

In this case, the Governor concluded that Gray's commitment offense was "especially heinous" for two reasons: (1) "because of the cold and calculated manner in which it was carried out;" and (2) because "the murder was committed after some level of premeditation, making it more egregious than the minimum elements necessary to sustain a conviction for second-degree murder."

As explained below, however, there is not some evidence that the nature of the commitment offense in this case was especially grave, constituted an especially heinous, atrocious or cruel second degree murder or that Gray premeditated.

including our use of the phrase 'particularly egregious,' conveyed only that the violence or viciousness of the inmate's crime must be more than *minimally necessary to convict him* of the offense for which he is confined." (*Dannenberg*, at p. 1095.)

(ii) *Heinous and Cold and Calculating Manner*

We begin with the Governor's finding that the crime was "especially heinous" on the ground that it was carried out "in a cold and calculated manner." Some evidence does not support this finding.

The regulation upon which the Governor relied provides one example of when a crime is cold and calculated, "an execution-style murder." (§ 2402, subd. (c)(1)(B).) There is no evidence in the record to suggest or support an inference that the killing of Waddell was an execution style murder.

Moreover, in a number of cases, the courts rejected the conclusions of the Governor and the Board that having a gun and committing a murder shows that the crime was cold and calculating and thus especially heinous under the regulation.

The *Scott* court rejected the Governor's conclusion that the second degree murder in that case was committed in a " ' "dispassionate and calculated manner" ' " under the regulations. (*Scott, supra,* 133 Cal.App.4th at p. 597.) Significantly, the facts of the present case show less planning and calculation than the facts in *Scott.*

In *Scott,* Scott learned that his wife had become addicted to cocaine and amphetamines. He also learned that his wife was having an affair with her drug dealer, Bradford. Scott reported Bradford's activities to the police, but they refused to respond. Bradford learned of Scott's attempts to involve the police, and threatened Scott's life. At one point, Bradford displayed a firearm. Scott became concerned for his personal safety. (*Scott, supra,* 133 Cal.App.4th at p. 579.)

On the evening in question, Scott's wife visited Scott at his new home to tell him she intended to stop using drugs and to end the relationship with Bradford. She then stated she was not feeling well and needed to go home for medication but would return to stay the night. When she failed to return, Scott went to Bradford's residence where he observed his 13-year-old son, his wife, Bradford, and others watching fireworks. Bradford and Scott's wife were hugging affectionately. Scott then approached with a handgun, at which point Bradford pushed Scott's wife out of the way and confronted Scott. Scott told Bradford to get away or he would shoot. Scott then shot two or three rounds, striking Bradford in the head and thigh. Three days later, Scott turned himself in. Seven days later, Bradford died. (*Scott, supra,* 133 Cal.App.4th 573.)

In 1986, a jury convicted Scott of second degree murder. The trial court sentenced him to 15 years to life, plus two years for the use of a firearm. In

2001, the Board denied Scott parole. (*Scott, supra,* 133 Cal.App.4th at p. 578.) Following a new hearing, the Board found Scott suitable for parole and set a parole release date. The Governor reversed, finding Scott would pose an unreasonable risk of danger to society. (*Scott, supra,* 133 Cal.App.4th at p. 578.) Scott filed a writ for a petition of habeas corpus. (*Ibid.*)

In *Scott,* the court found that the Governor's findings were not supported by some evidence and ordered Scott's release. (*Scott, supra,* 133 Cal.App.4th at pp. 578–579.) The court explained that the Governor's conclusion that the nature of the commitment offense justified denial of parole as an especially heinous crime was not supported by some evidence. (*Id.* at p. 597.) The court rejected the Governor's conclusion that the murder was dispassionate and calculating so as to make it especially heinous under the regulations. (*Ibid.*) The court explained that Scott was under significant stress at the time of the murder, and "[t]he Governor's indifference to this large body of evidence significantly distort[ed] the nature and gravity of Scott's commitment offense." (*Id.* at p. 596.) Properly considering the significant stress facing Scott, the court concluded that "the record . . . did not provide 'a scintilla of evidence' Scott committed his offense ' "in a dispassionate and calculated manner, such as an execution-style murder." ' " (*Id.* at p. 597.)

Likewise, *In re Weider* (2006) 145 Cal.App.4th 570, 575 [52 Cal.Rptr.3d 147] (*Weider*), the court rejected the Board's conclusion that the murder was dispassionate and calculating to make it especially heinous under the regulations. (*Id.* at pp. 587–588.)

In that case, in 1985, Weider and his wife of 26 years, Susan, helped a coworker, Laird, move out of his home after separating from his wife. Susan did not come home that night, claiming to have fallen asleep on Laird's couch. The next day, Susan and Weider and Susan's youngest daughter moved in with Laird. Two years later, Weider stopped into a restaurant to get something to eat and approached a table where Susan and Laird were seated. Susan started yelling at Weider, who had made two unsuccessful suicide attempts. He decided to kill himself in front of her. Weider then went to this car, came back with a loaded gun, and asked his wife it they could talk or should he kill himself and Laird. After additional confrontation, Weider and Laird stood up and Weider fired two shoots missing Laird. During a subsequent struggle, Weider shot and killed Laird. He also shot two other patrons in the bar. (*Weider, supra,* 145 Cal.App.4th at pp. 575–576.) Weider pled guilty and was sentenced to 15 years to life. (*Id.* at p. 576.) The Board denied parole on three occasions. (*Id.* at p. 577.)

In rejecting the Board's conclusion that the murder was dispassionate and calculating to make it especially heinous under the regulations, the *Weider*

court explained: "The Board's finding that the crime was 'dispassionate' and 'calculated' does not conform to the appropriate standard, either. The finding was based upon evidence that Weider 'took a weapon into a bar, into a public place.' But in deciding whether the crime was particularly heinous, atrocious, or cruel, the Board is to consider whether '[t]he offense was carried out in a dispassionate and calculated manner, such as an execution-style murder.' (§ 2402, subd. (c)(1)(B).) The murder the Board describes is not at all like an execution-style murder. The fatal wound was delivered during the struggle over the gun. *And there was no evidence that Weider conducted himself dispassionately. To the contrary, the evidence shows that he was angry or distraught.*" (*Weider, supra,* 145 Cal.App.4th at pp. 587–588, italics added.)

Pursuant to the *Scott* and *Weider*, the Governor's conclusion that Gray's crime was cold and calculating to make it especially heinous under the pertinent regulations is not supported by some evidence.

In this case, unlike *Scott*, the evidence shows that Waddell and Jacqueline traveled to Gray's residence to confront him. (In *Scott*, Scott went to Bradford's house.) The undisputed evidence shows that Gray did not know that Waddell and Jacqueline had arrived at his house on the evening in question, and that Gray intended to leave before their arrival. In fact, Waddell and Jacqueline lived approximately 45 minutes from Gray's house. After receiving Waddell's threatening phone call, Gray decided to leave for his brother's house with his gun. It is undisputed that Gray did not receive the phone calls that Waddell placed from outside of Gray's home.

As noted, the undisputed evidence was that Gray was attempting to leave the scene before the confrontation with Waddell. In fact, Gray was about to enter his car at the time of the incident. Moreover, Gray did not pull his weapon upon Waddell at the time that Waddell first confronted Gray about the car keys. Gray did not pull his weapon until Waddell physically approached Gray, threatened him he was going to teach Gray a lesson and told Gray that his little gun did not scare him. Gray testified at that point in time that he was fearful of Waddell. Gray understood that his wife, Jacqueline, may have given Waddell a gun. In addition, Gray believed that Waddell was armed based upon his threatening approach and his statement that Gray's little gun did not scare him.

On this record, no evidence supports the conclusion that the killing of Waddell was cold and calculating or dispassionate so as to make the murder especially heinous under the regulation. The evidence shows that the killing occurred as the result of significant stress in Gray's life and his fear of Waddell in a threatening confrontation. Thus, the Governor's inference that

Gray armed himself (and was cold and calculating) because he knew that he would be confronting Waddell on the day in question is not supported by any evidence.

### (iii) *Premeditation*

The Governor also found that the nature of the commitment offense was a sufficient basis to deny parole because Gray's "actions suggested that the murder was committed after some level of premeditation, making it more egregious than the minimum elements necessary to sustain a conviction for second degree murder."[11] Apparently, the Governor concluded that the manner in which Gray committed the offense showed an element, premeditation, which was not an element of second degree murder, but was instead an element of first degree murder. (See Pen. Code, § 189.) Some evidence does not support the finding or premeditation.

The *Scott* court addressed this precise issue, that is, whether Scott's murder of Bradford showed circumstances, premeditation, beyond the minimum elements necessary for second degree murder. The court concluded that there was not sufficient evidence to show premeditation. (*Scott, supra,* 133 Cal.App.4th at pp. 598–600.) Significantly, in *Scott,* Scott traveled to Bradford's house armed with a gun, showing far more planning than that exercised by Gray in this case.

The *Scott* court also looked at cases presenting facts supporting a finding of premeditation. The *Scott* court stated: "For example, premeditation was considered in *Rosenkrantz* because, though the prisoner had been convicted only of second degree murder, the evidence showed ' "a full week of careful preparation, rehearsal and execution," ' and that the prisoner, who 'fired 10 shots at close range from an assault weapon and fired at least three or four shots into the victim's head as he lay on the pavement,' carried out the crime with 'planning, sophistication or professionalism.' (*Rosenkrantz,* [*supra,* 29 Cal.4th] at p. 678.) Similarly, the evidence of premeditation relied on in *In re Lowe* (2005) 130 Cal.App.4th 1405 [31 Cal.Rptr.3d 1], which also involved a second degree murder conviction, showed that the prisoner purchased the gun shortly before the murder, entered his victim's bedroom in the middle of the night while he was asleep, unsuspecting, and in a special relationship of confidence and trust with his killer, ' "and shot him five times in the head and chest, execution style." ' (*Id.* at p. 1414.) As the court stated, this evidence showed the murder ' "was a cold-blooded execution" ' and that the prisoner's

---

[11] As explained in *Rosenkrantz,* denial of parole can be based solely upon the nature of the commitment offense when the circumstances of the offense reasonably could be considered more aggravated or violent than the minimum necessary to sustain a conviction for that offense. (*Rosenkrantz, supra,* 29 Cal.4th at p. 683.)

' "egregious acts [were] far more aggravated than the minimum necessary to sustain a second degree murder conviction." ' (*Id.* at p. 1415.) In *In re DeLuna* [(2005)] 126 Cal.App.4th 585 [24 Cal.Rptr.3d 643], the petitioner, convicted of second degree murder, had a physical confrontation with the victim in a bar, left the bar, retrieved a rifle, shot the victim in the mouth and, as the victim bled and walked around the parking lot, followed him and continued firing until he died. The Court of Appeal determined that '[t]he initial wounding and deliberate stalking of a defenseless victim can reasonably be characterized as especially cruel and callous.' (*Id.* at p. 593.)" (*Scott, supra,* 133 Cal.App.4th at p. 598.)

The *Scott* court distinguished the foregoing cases involving premeditation: "The circumstances of Scott's offense shown by the record, which bear no resemblance to the circumstances of the homicides in *Rosenkrantz, Lowe,* and *DeLuna,* cannot reasonably be considered more aggravated or violent than the minimum necessary to sustain a conviction of second degree murder." (*Scott, supra,* 133 Cal.App.4th at p. 598.)

Likewise, in this case, the circumstances of Gray's offense bear no resemblance to the circumstances of the homicides in *Rosenkrantz, Lowe,* and *DeLuna* and cannot reasonably be considered more aggravated than the minimum necessary to sustain a conviction of second degree murder.

The *Weider* court also addressed the issue of whether Weider's murder showed circumstances, premeditation, beyond the minimum elements necessary for second degree murder. There, as noted above, after an initial confrontation in a restaurant, Weider went to his car to retrieve a gun. After a physical struggle, he then killed his former wife's lover in the restaurant. Weider pled guilty to second degree murder. (*Weider, supra,* 145 Cal.App.4th at pp. 575–577.)

The *Weider* court rejected the Board's finding that the crime was "particularly egregious" on the basis that it involved an element, premeditation, which was more than minimally necessary to convict. (*Weider, supra,* 145 Cal.App.4th at p. 587.) Specifically, the *Weider* court rejected the Board's assertion that because Weider retrieved the gun from his car, the crime showed premeditation, an element exceeding the minimum elements necessary to sustain a conviction for second degree murder. (*Id.* at p. 588.)

Comparing the facts of *Rosenkrantz, In re Lowe, supra,* 130 Cal.App.4th 1405, and *In re DeLuna, supra,* 126 Cal.App.4th 585, to the case before it, the *Weider* court explained: "Each of the foregoing cases upheld a parole denial based upon circumstances that were more egregious than necessary for a second degree murder conviction. But the circumstances in those cases—

rehearsing the murder, executing of a sleeping victim, stalking—reflect behavior that reasonably suggests that the inmate could present a danger if released. That is, these cases implicitly acknowledge that the overarching consideration in the suitability determination is whether the inmate is currently a threat to public safety. [Citations.] Weider's act of simply going out to his car to retrieve the murder weapon does not reflect the type of heinous, atrocious, or cruel behavior described in the foregoing cases and does not rationally indicate that he will present an unreasonable public safety risk if released from prison." (*Weider, supra,* 145 Cal.App.4th at p. 589.)

We agree with the rationale of the *Weider* court. Gray's act of going out to his car while armed to drive to his brother's house does not constitute evidence of premeditation to make this second degree murder particularly heinous under the regulation.

In this case, no evidence supports the Governor's characterization of this crime as premeditated. The undisputed evidence shows that Gray was trying to leave the scene before Waddell arrived. The evidence also shows that Gray was fearful of Waddell, he believed that Waddell was armed, and that Gray was under significant stress at the time of the killing.

In addition, it is significant that Gray did not pull his weapon on Waddell at the time of the confrontation about the car keys. Instead, Gray voluntarily gave the car keys to Waddell without incident. It was not until later when Waddell physically approached Gray and threatened him that he (Waddell) would teach him a lesson, that Gray pulled his gun. In response, Waddell stated that Gray's "little gun" did not scare him, a statement reasonably supporting Gray's belief that Waddell may have been armed. These facts do not show a premeditated murder under the foregoing cases, but instead a crime that was committed in fear and as the result of significant life stress.

### 4. Conclusion

No evidence supports the Governor's findings that the murder of Waddell was conducted in a cold and calculated manner or that the crime showed an element, premeditation, which was beyond the minimum elements necessary for second degree murder.

### DISPOSITION

The Governor's decision reversing the 2005 Board decision finding Gray suitable for parole and setting a parole date is vacated. Gray's petition for a writ of habeas corpus is granted.

As in *Smith I, supra,* 109 Cal.App.4th at page 507; *Scott, supra,* 133 Cal.App.4th at page 604; and *Elkins, supra,* 144 Cal.App.4th at page 503, the Board is ordered to release Gray forthwith pursuant to the conditions set forth in the January 27, 2005 decision by the Board.

Considering that Gray's release by the Board would have been final in February 2005, well over two years ago, and in the interests of justice, this opinion shall be final as to this court immediately. (Cal. Rules of Court, rule 8.264 (b)(3).)

Klein, P. J., and Aldrich, J., concurred.