Filed 6/7/13  In re Reed CA4/1
Opinion following order vacating prior opinion

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## OPINION AFTER TRANSFER FROM THE CALIFORNIA SUPREME COURT

## COURT OF APPEAL - FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| In re MELVIN R. REED, JR.<br><br>on<br><br>Habeas Corpus. | D058592<br><br>(San Diego County<br>Super. Ct. No. SCD114255) |

Petition for Writ of Habeas Corpus, Howard H. Shore, Judge.  Relief denied.

Charles R. Khoury, Jr., under appointment by the Court of Appeal, for Petitioner.

Kamala D. Harris,  Attorney General, Julie L. Garland, Senior Assistant Attorney General, Phillip Lindsay and Michael Rhoads, Deputy Attorneys General, for Respondent and Real Party in Interest.

In 1996, Melvin Reed was convicted of assault on a child resulting in death and was sentenced to a prison term of 15 years to life.  Reed, now 36 years old, has been incarcerated for more than 17 years.

At Reed's first parole hearing, the Board of Parole Hearings (BPH) found him unsuitable for parole.  The BPH found the commitment offense was particularly

egregious under many indices and, considering numerous other factors (including Reed's prior criminal record, his disciplinary record while incarcerated, his failure to gain insight into the commitment offense, and his psychological evaluation), Reed was not currently suitable for parole. The BPH further concluded a 10-year denial of parole was appropriate under the circumstances.

Reed petitioned the trial court for writ of habeas corpus, but the court denied the writ, concluding the BPH's decision was supported by some evidence. Reed then petitioned this court for a writ of habeas corpus. We issued an order to show cause, the People filed a return, and Reed filed a traverse. Reed asserted (1) the BPH's decision to deny parole violated due process because its conclusion that he posed an unreasonable risk of danger to society if released on parole was contrary to the evidence that he was not currently dangerous, and (2) the amendments to Penal Code section 3041.5, subdivision (b),[1] adopted after the voters approved Proposition 9, otherwise known as the "Victims' Bill of Rights Act of 2008: Marsy's Law" (Ballot Pamp., Gen. Elec. (Nov. 4, 2008) text of Prop. 9, p. 128, hereafter Marsy's Law), when applied to him violated ex post facto principles.

In our original opinion, filed July 25, 2011, we concluded that, although there was sufficient evidence from which the BPH could have concluded Reed was not currently suitable for parole, the scheduling of Reed's next suitability hearing under the 10-year provision pursuant to the amendments to section 3041.5, subdivision (b), violated ex post

---

1       All statutory references are to the Penal Code unless otherwise specified.

facto principles. Accordingly, we affirmed in part and reversed in part. However, the Supreme Court granted the People's petition for review and, by its subsequent order of May 1, 2013, the Supreme Court has directed that we vacate our decision and reconsider the cause in light of *In re Vicks* (2013) 56 Cal.4th 274. Our original opinion is vacated and replaced by this opinion.

We reaffirm our original conclusion that the BPH's decision to deny parole was supported by some evidence, pursuant to the guidance provided by *In re Lawrence* (2008) 44 Cal.4th 1181 (*Lawrence*) and *In re Shaputis* (2008) 44 Cal.4th 1241. However, we conclude *Vicks* compels us to reject Reed's claim that application of the amendments to section 3041.5, subdivision (b), to inmates whose commitment offense was committed prior to the effective date of Marsy's Law violates ex post facto principles.

I

FACTS

A. <u>The Commitment Offense</u>

In 1996, Reed was convicted of physically assaulting a child resulting in the child's death. Reed was under the influence of drugs when the child, his girlfriend's 17-month old son, woke Reed with his crying. Reed struck the child in the abdomen with such force that his liver was forced against his spine, lacerating the liver and causing death. Because the facts of the crime support the BPH's determination that the commitment offense was particularly heinous, atrocious, or cruel (Cal. Code Regs., tit.

3

15, § 2402, subd. (b)),[2] and Reed does not dispute that this aspect of the BPH's determination is supported by the requisite level of evidence, we do not further detail the commitment offense.

B. Reed's Criminal Background

Reed had a prior juvenile criminal history of both violent and nonviolent offenses.

C. Reed's Disciplinary Record in Prison

During his time in prison, Reed received numerous "CDC 115's," the latest of which was in 2004, and many of those violations involved violence. During his time in prison, he has also received several "CDC 128's." "[A] CDC 115 documents misconduct believed to be a violation of law which is not minor in nature. A form 128 documents incidents of minor misconduct." (*In re Gray* (2007) 151 Cal.App.4th 379, 389.)

D. Reed's Psychological Evaluation

A psychologist evaluated Reed and his report was received by the BPH without objection. The psychologist interviewed Reed and, based on the interview, concluded Reed did not have insight into the factors that led to his conduct, was unable to express genuine remorse for his conduct, and had not availed himself of the opportunities in

---

[2] Factors supporting the finding that the crime was committed "in an especially heinous, atrocious or cruel manner" (Cal. Code Regs., tit. 15, § 2402, subd. (c)(1)), include the following: (A) multiple victims were attacked, injured, or killed in the same or separate incidents; (B) the offense was carried out in a dispassionate and calculated manner, such as an execution-style murder; (C) the victim was abused, defiled, or mutilated during or after the offense; (D) the offense was carried out in a manner that demonstrates an exceptionally callous disregard for human suffering; and (E) the motive for the crime is inexplicable or very trivial in relation to the offense.

prison to acquire insight or develop the empathy for others necessary to function appropriately in society.

The psychologist also evaluated Reed's potential for violence under two separate empirically-based assessment guides,[3] and evaluated Reed's general risk of recidivism under another empirically based-assessment guide.[4] Reed's PCL-R score placed him in the "moderately high range" for future violence, and the tests suggested tendencies toward "Glibness, Superficial Charm, . . . Pathological Lying . . . , Conning, Manipulative, Lack of Remorse or Guilt, Shallow Affect, Callous/Lack of Empathy, Parasitic Lifestyle, Poor Behavioral Controls, . . . Impulsivity, Irresponsibility, [and] Failure to Accept Responsibility for Own Actions . . . ." Reed's score on the HCR-20 placed him in the "moderately high" risk category for violent recidivism. The LS/CMI placed him in the "high" category for risk of recidivism. The psychologist concluded, based on his clinical assessment and the empirical guides, that Reed presented a "relatively [h]igh risk for violence in the free community."

E. Reed's Rehabilitative Efforts

Reed's participation in institutional programming and self-help groups was sporadic, and his educational and vocational training was sparse.

---

3    The guides used to assess Reed's potential for violence were the Psychopathy Checklist-Revised (PCL-R) and the History-Clinical-Risk Management-20 (HCR-20).

4    The guide used to assess Reed's general risk of recidivism was the Level of Service/Case Management Inventory (LS/CMI).

F. Parole Plans

The evidence supports the BPH's conclusion that Reed's parole plans were "non-existent": he had not identified a facility willing to accept him on release, had no job arranged, and had no letters offering financial or other support on his release from prison.

II

HISTORY OF PROCEEDINGS

A. The BPH Proceedings

Reed's minimum eligible parole date was in 2010. At his 2009 parole hearing, the BPH considered Reed's testimony, as well as the written reports, and concluded he was unsuitable for parole because he posed an unreasonable risk of danger to society if released. The BPH relied on the facts of the crime, his prior criminal record, his current level of insight into or acceptance of responsibility for the crime, his disciplinary record while in prison, his psychological evaluation, his limited programming while incarcerated, and his lack of parole plans to conclude he was not currently suitable for parole. The BPH scheduled Reed's next parole eligibility hearing 10 years from his 2009 hearing pursuant to section 3041.5, subdivision (b)(3)(C).

B. The Habeas Proceedings

Reed filed a petition for writ of habeas corpus in the San Diego County Superior Court, which denied the petition, finding there was some evidence to support the BPH's decision. Reed then petitioned this court for a writ of habeas corpus.

III

LEGAL STANDARDS

A. The Parole Decision

The decision whether to grant parole is a subjective determination (*In re Rosenkrantz* (2002) 29 Cal.4th 616, 655 (*Rosenkrantz*)) that should be guided by a number of factors, some objective, identified in section 3041 and the BPH's regulations. (Cal. Code Regs., tit. 15, §§ 2281, 2402.) In making the suitability determination, the BPH must consider "[a]ll relevant, reliable information" (Cal. Code Regs., tit. 15, § 2402, subd. (b)), including the nature of the commitment offense; behavior before, during, and after the crime; the inmate's social history; mental state; criminal record; attitude toward the crime; and parole plans. (Cal. Code Regs., tit. 15, § 2402, subd. (b).) The circumstances that tend to show *unsuitability* for parole include that the inmate: (1) committed the offense in a particularly heinous, atrocious, or cruel manner; (2) possesses a previous record of violence; (3) has an unstable social history; (4) has previously sexually assaulted another individual in a sadistic manner; (5) has a lengthy history of severe mental problems related to the offense; and (6) has engaged in serious misconduct while in prison. (Cal. Code Regs., tit. 15, § 2402, subd. (c).) A factor that alone might not establish unsuitability for parole may still contribute to a finding of unsuitability. (Cal. Code Regs., tit. 15, § 2402, subd. (b).)

Circumstances tending to show *suitability* for parole include that the inmate: (1) does not possess a record of violent crime committed while a juvenile; (2) has a stable social history; (3) has shown signs of remorse; (4) committed the crime as the result of

7

significant stress in his or her life, especially if the stress had built over a long period of time; (5) committed the criminal offense as a result of battered woman syndrome; (6) lacks any significant history of violent crime; (7) is of an age that reduces the probability of recidivism; (8) has made realistic plans for release or has developed marketable skills that can be put to use on release; and (9) has engaged in institutional activities that indicate an enhanced ability to function within the law on release. (Cal. Code Regs., tit. 15, § 2402, subd. (d).)

These criteria are general guidelines, illustrative rather than exclusive, and "the importance attached to [any] circumstance [or combination of circumstances in a particular case] is left to the judgment of the [BPH]." (*Rosenkrantz, supra,* 29 Cal.4th at p. 679; Cal. Code Regs., tit. 15, § 2402, subds. (c), (d).) The endeavor is to try "to predict by subjective analysis whether the inmate will be able to live in society without committing additional antisocial acts." (*Rosenkrantz,* at p. 655.) Because parole unsuitability factors need only be found by a preponderance of the evidence, the BPH may consider facts other than those found true by a jury or judge beyond a reasonable doubt. (*Id*. at p. 679.)

B. Standard for Judicial Review of Parole Decisions

In *Rosenkrantz*, the California Supreme Court addressed the standard for a court to apply when reviewing a parole decision by the executive branch. The court first held that "the judicial branch is authorized to review the factual basis of a decision of the [BPH] denying parole . . . to ensure that the decision comports with the requirements of due process of law, but that in conducting such a review, the court may inquire only whether

8

some evidence in the record before the [BPH] supports the decision to deny parole, based on the factors specified by statute and regulation." (*Rosenkrantz, supra,* 29 Cal.4th at p. 658.)

In *Lawrence,* the Supreme Court noted that its decisions in *Rosenkrantz* and *In re Dannenberg* (2005) 34 Cal.4th 1061, and specifically *Rosenkrantz's* characterization of "some evidence" as "extremely deferential" and requiring "[o]nly a modicum of evidence" (*Rosenkrantz, supra,* 29 Cal.4th at p. 667), had generated confusion and disagreement among the lower courts "regarding the precise contours of the 'some evidence' standard." (*Lawrence, supra*, 44 Cal.4th at p. 1206.) *Lawrence* explained some courts interpreted *Rosenkrantz* as limiting the judiciary to reviewing whether "some evidence" exists to support an unsuitability factor cited by the BPH or Governor, and other courts interpreted *Rosenkrantz* as requiring the judiciary to instead review whether "some evidence" exists to support "the core determination required by the statute before parole can be denied--that an inmate's release will unreasonably endanger public safety." (*Lawrence,* at pp. 1207-1209.)

The *Lawrence* court, recognizing the legislative scheme contemplates "an assessment of an inmate's *current* dangerousness" (*Lawrence, supra,* 44 Cal.4th at p. 1205), resolved the conflict among the lower courts by clarifying that the analysis required when reviewing a decision relating to a prisoner's current suitability for parole is "whether some evidence supports the *decision* of the Board or the Governor that the inmate constitutes a current threat to public safety, and not merely whether some evidence confirms the existence of certain factual findings." (*Id*. at p. 1212.) *Lawrence*

9

clarified that the standard for judicial review, although "unquestionably deferential, [is] certainly . . . not toothless, and 'due consideration' of the specified factors requires more than rote recitation of the relevant factors *with no reasoning establishing a rational nexus between those factors and the necessary basis for the ultimate decision*--the determination of current dangerousness." (*Id.* at p. 1210, italics added.) Indeed, it is *Lawrence's* numerous iterations (and variants) of the requirement of a "rational nexus" between the *facts* underlying the unsuitability factor and the *conclusion* of current dangerousness that appears to form the crux of, and provide the teeth for, the standards adopted in *Lawrence* to clarify and illuminate "the precise contours of the 'some evidence' standard." (*Id.* at p. 1206.)

After clarifying the applicable standard of review, *Lawrence* addressed how one "unsuitability" factor--whether the prisoner's commitment offense was done in a particularly heinous, atrocious, or cruel manner--can affect the parole suitability determination, and whether the existence of some evidence supporting the BPH's finding that the offense was particularly heinous, atrocious, or cruel is alone sufficient to deny parole. *Lawrence* concluded that when there has been a lengthy passage of time, the BPH may continue to rely on the nature of the commitment offense as a basis to deny parole only when there are *other* facts in the record, including the prisoner's history before and after the offense or the prisoner's current demeanor and mental state, that provide a rational nexus for concluding an offense of ancient vintage continues to be predictive of current dangerousness. (*Lawrence, supra,* 44 Cal.4th at pp. 1211, 1214, 1221.)

10

IV

ANALYSIS OF CHALLENGE TO UNSUITABILITY FINDING

Reed appears to assert there is no evidence of sufficient substantiality on which the BPH could properly rest its determination that he would pose an unreasonable risk of danger to the community if released, because there is no logical nexus between the facts relied on by the BPH and its conclusion that he is currently dangerous.

We conclude there is sufficient evidence from which the BPH could have concluded Reed was unsuitable for parole. There is no dispute the evidence permitted the BPH to conclude the crime was especially egregious. However, because there has been a lengthy passage of time since that crime was committed, *Lawrence* teaches that the BPH may continue to rely on the nature of the commitment offense as a basis to deny parole only when other facts in the record, including the inmate's history before and after the offense or the inmate's current demeanor and mental state, provide a rational nexus for concluding those offenses continue to be predictive of current dangerousness. (*Lawrence, supra,* 44 Cal.4th at pp. 1211, 1214, 1221.) We conclude that, in this case, there is some evidence--including Reed's history before and after the offense as well as his current demeanor and mental state--from which the BPH could rationally conclude the commitment crime remains probative of Reed's dangerousness.

A. Reed's History Before and After the Offenses

Reed's criminal record before the commitment offense did involve violence, and his postincarceration conduct showed he continued to be violent and was unable to adhere to rules despite imprisonment. Although Reed's *recent* disciplinary record in

prison has improved, he received numerous disciplinary citations while in the highly controlled setting of a prison, including violence and manufacturing intoxicants, which undermines the credibility of his assertions that his long history of substance abuse and violence was a distant memory.  Because Reed had shown that, despite years of institutionalization, he could relapse into behavior patterns that may have contributed to the crime for which he was committed, the BPH could conclude an additional period of discipline-free behavior was required to show that the influences and impulses leading to the crime had been eradicated to a sufficient degree that he would not pose an unreasonable risk of relapsing into prior behavioral patterns.

B. Reed's Current Demeanor and Mental State

In addition to Reed's pre- and postincarceration behavior, the BPH considered and expressly relied on the facts and opinions contained in the psychological evaluation.  The psychologist's observations, and particularly the psychologist's opinion that Reed's mental state (especially his tendency to discount his criminal history and to not understand the underlying sources of his antisocial/criminal behavior) would be expected to cause difficulties with Reed's ability to identify and change his poor decision-making and to avoid relapsing into antisocial conduct, provide some evidence under *Shaputis* to support the BPH's finding that he posed an unreasonable risk to the community if released on parole.

In this proceeding, Reed cites snippets of the report as supportive of his claim that he is not currently dangerous, but then ignores the context in which those statements were made and ignores the conclusions reached by that evaluator.  We believe the

12

psychologist's adverse report provided the requisite evidence to support the finding of unsuitability.

C. Additional Evidence of Unsuitability

The BPH properly relied on additional evidence to find Reed was unsuitable for parole. He minimized or rationalized his prison misconduct, claiming his disciplinary citations were just "little things [that] are going to happen" in prison, and that he manufactured alcohol because he needed the money to buy food and personal hygiene materials, which could support the conclusion that Reed would continue to act in antisocial ways when he believed his self-interest justified those actions. He eschewed significant efforts at participating in rehabilitative activities, and had no extant parole plans, both of which factors may properly be relied on to determine unsuitability. (See Cal. Code Regs., tit. 15, § 2402, subds. (d)(8) & (d)(9).)

D. Conclusion

We conclude the BPH's unsuitability determination is supported by some evidence, and therefore affirm its determination on the issue of Reed's current unsuitability for parole.

V

ANALYSIS OF EX POST FACTO CHALLENGE

The BPH concluded a 10-year deferral before Reed would again be considered for parole, as permitted under section 3041.5, subdivision (b)(3), was appropriate. Reed argues applying the amendments to section 3041.5, subdivision (b), which implement

13

aspects of Marsy's Law to permit the 10-year deferral, to him would violate ex post facto principles.

In *Vicks*, the Supreme Court considered whether application of the amendments to section 3041.5, subdivision (b), which implement aspects of Marsy's Law to permit longer deferrals of subsequent suitability hearings, would violate ex post facto principles if applied to prisoners whose crimes predated that law, and found no constitutional infirmity existed. Because of *Vicks*, we reject Reed's challenge to the BPH's 2009 order insofar as it scheduled Reed's next parole hearing according to the standards and procedures of section 3041.5, as amended pursuant to Marsy's Law.

## DISPOSITION

The relief requested in Reed's petition for a writ of habeas corpus is denied.

McDONALD, Acting P. J.

WE CONCUR:

McINTYRE, J.

AARON, J.